IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE, *ex rel.* KATHLEEN JENNINGS, Attorney General of the State of Delaware,<br><br>     *Plaintiff*,<br><br>     v.<br><br>BP AMERICA INC., BP P.L.C., CHEVRON CORPORATION, CHEVRON U.S.A. INC., CONOCOPHILLIPS, CONOCOPHILLIPS COMPANY, PHILLIPS 66, PHILLIPS 66 COMPANY, EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, XTO ENERGY INC., HESS CORPORATION, MARATHON OIL CORPORATION, MARATHON OIL COMPANY, MARATHON PETROLEUM CORPORATION, MARATHON PETROLEUM COMPANY LP, SPEEDWAY LLC, MURPHY OIL CORPORATION, MURPHY USA INC., ROYAL DUTCH SHELL PLC, SHELL OIL COMPANY, CITGO PETROLEUM CORPORATION, TOTAL S.A., TOTAL SPECIALTIES USA INC., OCCIDENTAL PETROLEUM CORPORATION, DEVON ENERGY CORPORATION, APACHE CORPORATION, CNX RESOURCES CORPORATION, CONSOL ENERGY INC., OVINTIV, INC., and AMERICAN PETROLEUM INSTITUTE,<br><br>     *Defendants*. | C.A. No. 1:20-cv-01429-LPS |

## **OPENING BRIEF IN SUPPORT OF MOTION TO REMAND TO STATE COURT**

DELAWARE DEPARTMENT OF JUSTICE

Christian Douglas Wright (#3554)
Jameson A.L. Tweedie (#4927)
Ralph K. Durstein III (#0912)
820 N. French Street
Wilmington, DE 19801
Tel.: (302) 577-8600

SHER EDLING LLP

Victor M. Sher, *pro hac vice*
Matthew K. Edling, *pro hac vice*
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
Tel.: (628) 231-2500

*Attorneys for Plaintiff State of Delaware*

January 5, 2021

# TABLE OF CONTENTS

I.     **NATURE AND STAGE OF THE PROCEEDINGS** ........................................1

II.    **SUMMARY OF ARGUMENT** ...........................................................1

III.   **STATEMENT OF FACTS** ...............................................................4

IV.   **ARGUMENT** ...................................................................................6

    A.   Legal standard ........................................................................6

    B.   Federal common law is not a basis for removal. ....................7

         1.   Federal common law cannot provide an independent basis for removal. ..........8

         2.   This case has nothing to do with any body of federal common law. ................10

         3.   The federal common law of interstate greenhouse gas emissions, if it ever existed, has been displaced by the Clean Air Act. ...........................11

    C.   There is no *Grable* jurisdiction because the Complaint does not "necessarily raise" any substantial, disputed federal questions. ..............................13

         1.   The Complaint does not necessarily raise any issue of federal law that is actually disputed. ..............................14

         2.   The federal questions Defendants rely on are not "substantial," and the federal-state balance favors adjudication of these Delaware-law claims in Delaware's own courts. ..................................18

    D.   The Complaint's state-law claims are not completely preempted. .........................19

    E.   There is no federal officer removal jurisdiction because no federal officer directed the Defendants' tortious conduct. ..........................25

         1.   The Complaint disclaims injuries arising from Defendants' provision of fossil fuels to the federal government, and Defendants therefore seek to assert a defense against a claim that does not exist. .............................26

         2.   Defendants' campaign of deception and other wrongful conduct were not "for, or relating to" any act under color of federal office, including the activities described in the Notice of Removal. ....................28

         3.   Defendants cannot show they were acting under a federal officer. ....................33

    F.   There is no OCSLA jurisdiction because the State's claims do not arise out of and are not connected with the Outer Continental Shelf. ..............................49

    G.   There is no enclave jurisdiction because the State's claim did not "arise" within any federal enclave. .................................54

    H.   The Class Action Fairness Act does not apply because this case is not a class action. ..................................58

    I.   Defendants' attacks on the merits of the State's claims are misguided. ..................61

V.    **CONCLUSION** ...............................................................................63

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdullah v. Am. Airlines, Inc.*,
181 F.3d 363 (3d Cir. 1999) ................................................................ 17

*Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*,
731 F.3d 740 (7th Cir. 2013) .............................................................. 60

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004) ............................................................................ 21

*Akin v. Ashland Chem. Co.*,
156 F.3d 1030 (10th Cir. 1998) .......................................................... 54

*Am. Elec. Power Co., Inc. v. Connecticut*,
564 U.S. 410 (2011) ................................................................ 8, 11, 12

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ............................................................................ 24

*Baker v. Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) .................................................. 31, 32, 49

*Ballard v. Ameron Int'l Corp.*,
No. 16-CV-06074-JSC, 2016 WL 6216194 (N.D. Cal. Oct. 25, 2016) ............................ 56, 57

*Ballenger v. Agco Corp.*,
No. C 06–2271 CW, 2007 WL 1813821 (N.D. Cal. June 22, 2007) ........................................ 27

*Bennett v. Southwest Airlines Co.*,
484 F.3d 907 (7th Cir. 2007) .................................................... 16, 17

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
405 F. Supp. 3d 947 (D. Colo. 2019) ............................................ *passim*

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
965 F.3d 792 (10th Cir. 2020) ...................................................... *passim*

*Beneficial Nat'l Bank v. Anderson*,
539 U.S. 1 (2003) ........................................................................ 20, 21

*Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*,
850 F.3d 714 (5th Cir. 2017) .............................................................. 16

*Bordetsky v. Akima Logistics Servs., LLC*,
No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D.N.J. Feb. 16, 2016) .................................... 54

*Brooklyn Union Expl. Co. v. Tejas Power Corp.*,
930 F. Supp. 289 (S.D. Tex. 1996) .................................................... 51

*Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA,*
   779 F.3d 214 (3d Cir. 2015) ............................................................................... 7

*Caterpillar Inc. v. Williams,*
   482 U.S. 386 (1987) ...................................................................................... 7, 20

*Central Bank, N.A. v. First Interstate Bank, N.A.,*
   511 U.S. 164 (1994) .......................................................................................... 60

*Cessna v. Rea Energy Coop., Inc.,*
   753 F. App'x 124 (3d Cir. 2018) ....................................................................... 61

*Chevron U.S.A., Inc. v. United States,*
   110 Fed. Cl. 747 (2013) .................................................................................... 44

*City of New York v. BP P.L.C.,*
   325 F. Supp. 3d 466 (S.D.N.Y. 2018) ............................................................... 8

*City of Oakland v. BP PLC,*
   969 F.3d 895 (9th Cir. 2020) ..................................................................... *passim*

*Coleman v. Trans Bay Cable, LLC,*
   No. 19-CV-02825-YGR, 2019 WL 3817822 (N.D. Cal. Aug. 14, 2019) ........... 29, 54, 56

*Coll. of Dental Surgeons of Puerto Rico v. Connecticut Gen. Life Ins. Co.,*
   585 F.3d 33 (1st Cir. 2009) .............................................................................. 60

*Corley v. Long-Lewis, Inc.,*
   688 F. Supp. 2d 1315 (N.D. Ala. 2010) ........................................................... 57

*Cnty. of San Mateo v. Chevron Corp.,*
   294 F. Supp. 3d 934 (N.D. Cal. 2018) ...................................................... *passim*

*Cnty. of San Mateo v. Chevron Corp.*
   960 F.3d 586 (9th Cir. 2020) ..................................................................... *passim*

*Davis v. Wells Fargo,*
   824 F.3d 333 (3d Cir. 2016) ............................................................................. 61

*Denn v. Purdue Pharma L.P.,*
   No. CV 1:18-383-RGA, 2018 WL 1942363 (D. Del. Apr. 25, 2018) .............. 14, 18

*Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.,*
   693 F.3d 1195 (10th Cir. 2012) ................................................................... 21, 23

*Durham v. Lockheed Martin Corp.,*
   445 F.3d 1247 (9th Cir. 2006) ................................................................ 54, 56, 57

*Empire Healthchoice Assurance, Inc. v. McVeigh,*
   547 U.S. 677 (2006) .......................................................................................... 13

*EP Operating Ltd. P'ship v. Placid Oil Co.,*
   26 F.3d 563 (5th Cir. 1994) .................................................................. 50, 52, 53

*Erie Ins. Exch. v. Erie Indem. Co.*,
   722 F.3d 154 (3d Cir. 2013).................................................................................. 58, 59, 60, 61

*Exxon Mobil Corp. v. Allapattah Servs.*,
   545 U.S. 546 (2005)........................................................................................................... 6

*Exxon Mobil Corp. v. United States*,
   No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ....................................... 34

*Faulk v. Owens-Corning Fiberglass Corp.*,
   48 F. Supp. 2d 653 (E.D. Tex. 1999)................................................................................. 31

*Fisher v. Asbestos Corp.*,
   No. 2:14-CV-02338-WGY, 2014 WL 3752020 (C.D. Cal. July 30, 2014)................. 26, 27, 35

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963)......................................................................................................... 25

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*,
   463 U.S. 1 (1983)...................................................................................................... *passim*

*Frederico v. Home Depot*,
   507 F.3d 188 (3d Cir. 2007)................................................................................................. 7

*Freedom Holdings, Inc. v. Spitzer*,
   357 F.3d 205 (2d Cir. 2004).............................................................................................. 54

*Gilstrap v. United Air Lines, Inc.*,
   709 F.3d 995 (9th Cir. 2013)............................................................................................. 53

*Goepel v. Nat'l Postal Mail Handlers Union, a Div. of LIUNA*,
   36 F.3d 306 (3d Cir. 1994)................................................................................................ 21

*Goto v. Whelan*,
   No. 20-cv-01114 (HSG), 2020 WL 4590596 (N.D. Cal. Aug. 11, 2020) ............................... 55

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
   545 U.S. 308 (2005)................................................................................................... *passim*

*Gunn v. Minton*,
   568 U.S. 251 (2013)............................................................................................... 9, 13, 18

*Her Majesty The Queen In Right of the Province of Ontario v. City of Detroit*,
   874 F.2d 332 (6th Cir. 1989) ............................................................................................. 23

*Holliday v. Extex*,
   No. CIV. 05-00194SPK/LEK, 2005 WL 2158488 (D. Haw. July 6, 2005) ........................... 54

*Huron Portland Cement Co. v. City of Detroit, Mich.*,
   362 U.S. 440 (1960)......................................................................................................... 25

*In re Asbestos Litig.*,
   661 F. Supp. 2d 451 (D. Del. 2009).................................................................................. 26

*In re Commonwealth's Motion to Appoint Couns. Against or Directed to Defender Ass'n of Phila.*,
790 F.3d 457 (3d Cir. 2015) ................................................................................ *passim*

*In re Deepwater Horizon*,
745 F.3d 157 (5th Cir. 2014) ................................................................................ 50, 52

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
354 F. Supp. 3d 1122 (N.D. Cal. 2019) ................................................................ 59

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
428 F. Supp. 2d 1014 (D. Minn. 2006) ................................................................. 31

*In re MTBE Prods. Liab. Litig.*,
488 F.3d 112 (2d Cir. 2007) ................................................................................. 31

*In re Vehicle Carrier Servs. Antitrust Litig.*,
846 F.3d 71 (3d Cir. 2017) ................................................................................... 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
959 F.3d 1201 (9th Cir. 2020) .............................................................................. 25

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999) ............................................................................................. 51

*Johnson v. Am. Towers, LLC*,
781 F.3d 693 (4th Cir. 2015) ............................................................................... 22

*K&D LLC v. Trump Old Post Office LLC*,
951 F.3d 503 (D.C. Cir. 2020) ............................................................................. 51

*Keeney v. A.W. Chesterton Co.*,
No. CV 11-6192 PA (AGRX), 2011 WL 13220926 (C.D. Cal. Aug. 9, 2011) ..................... 27

*Kelly v. Monsanto Co.*,
No. 4:15 CV 1825 JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016) ......................... 36, 47

*LG Display Co. v. Madigan*,
665 F.3d 768 (7th Cir. 2011) ............................................................................... 59

*LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*,
No. CIVA 06-11248, 2007 WL 854307 (E.D. La. Mar. 16, 2007) ......................... 51

*M.K. by & through Barlowe K. v. Prestige Acad. Charter Sch.*,
302 F. Supp. 3d 626 (D. Del. 2018) ..................................................................... 15, 16

*Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
772 F.3d 158 (3d Cir. 2014) ................................................................................. 13, 14, 19

*Massachusetts v. Exxon Mobil Corp.*,
462 F. Supp. 3d 31 (D. Mass. 2020) .................................................................... *passim*

*Mayor & City Council of Baltimore v. BP P.L.C.*,
388 F. Supp. 3d 538 (D. Md. 2019) ..................................................................... *passim*

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   952 F.3d 452 (4th Cir. 2020) .................................................................................... *passim*

*Merrick v. Diageo Americas Supply, Inc.*,
   805 F.3d 685 (6th Cir. 2015) ........................................................................................ 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
   136 S. Ct. 1562 (2016) .................................................................................................... 9

*Metro. Edison Co. v. Penn. Pub. Util. Comm'n*,
   767 F.3d 335 (3d Cir. 2014) .................................................................................... 21, 24

*Metro. Life Ins. Co. v. Taylor*,
   481 U.S. 58 (1987) ........................................................................................................ 21

*Meyers v. Chesterton*,
   No. CIV.A., 15-292, 2015 WL 2452346 (E.D. La. May 20, 2015) ........................... 31

*Meyers v. CBS Corp.*,
   No. 15-30528, 2015 WL 13504685 (5th Cir. Oct. 28, 2015) ................................... 31

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
   571 U.S. 161 (2014) ...................................................................................................... 58

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
   701 F.3d 796 (5th Cir. 2012) ...................................................................................... 59

*Movsesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012) .................................................................................... 24

*Native Village of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) ................................................................................ 11, 12

*Nessel ex rel. Michigan v. AmeriGas Partners, L.P.*,
   954 F.3d 831 (6th Cir. 2020) ...................................................................................... 59

*Nevada v. Bank of Am. Corp.*,
   672 F.3d 661 (9th Cir. 2012) ...................................................................................... 19

*New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J.*,
   760 F.3d 297 (3d Cir. 2014) ........................................................................................ 21

*New Mexico ex rel. Balderas v. Monsanto Co.*,
   454 F. Supp. 3d 1132 (D.N.M. 2020) .................................................................... 47, 56

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016) ................................................................................... *passim*

*Parish of Plaquemines v. Total Petrochem. & Refining USA, Inc.*,
   64 F. Supp. 3d 872 (E.D. La. 2014) ............................................................................ 51

*Parlin v. DynCorp Int'l, Inc.*,
   579 F. Supp. 2d 629 (D. Del. 2008) ...................................................................... 13, 15

*People v. Conagra Grocery Prod. Co.*,
   17 Cal. App. 5th 51 (Cal. Ct. App. 2017) ....................................................... 53, 62

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
   559 F.3d 772 (8th Cir. 2009) ...................................................................... 16

*Pharm. Research & Mfrs. of Am. v. Concannon*,
   249 F.3d 66 (1st Cir. 2001) ......................................................................... 54

*Plains Gas Sols., LLC v. Tenn. Gas Pipeline Co.*,
   46 F. Supp. 3d 701 (S.D. Tex. 2014) ............................................................ 52

*Purdue Pharma L.P. v. Kentucky*,
   704 F.3d 208 (2d Cir. 2013).......................................................................... 59

*Recar v. CNG Producing Co.*,
   853 F.2d 367 (5th Cir. 1988) ....................................................................... 51

*Rhode Island v. Chevron Corp.*,
   393 F. Supp. 3d 142 (D.R.I. 2019)....................................................... *passim*

*Rhode Island v. Shell Oil Prod. Co.*,
   979 F.3d 50 (1st Cir. 2020) ................................................................. *passim*

*Rhodes v. MCIC, Inc.*,
   210 F. Supp. 3d 778 (D. Md. 2016) ............................................................... 27

*Rodriguez v. Fed. Deposit Ins. Corp.*,
   140 S. Ct. 713 (2020) ..................................................................................... 8

*Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R. Co.*,
   858 F.2d 936 (3d Cir. 1988)......................................................................... 21

*Ryan v. Dow Chem. Co.*,
   781 F. Supp. 934 (E.D.N.Y. 1992) ............................................................... 29

*Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc.*,
   958 F. Supp. 947 (D. Del. 1997)................................................................... 22

*Schmitt v. War Emergency Pipelines*,
   175 F.2d 335 (8th Cir. 1949) ....................................................................... 36

*Shell Oil Co. v. United States*,
   751 F.3d 1282 (Fed. Cir. 2014)..................................................................... 34

*Soto v. Bushmaster Firearms Int'l, LLC*,
   331 Conn. 53 (Conn. 2019)........................................................................... 25

*Sparling v. Doyle*,
   No. EP-13-CV-00323-DCG, 2014 WL 2448926 (W.D. Tex. May 30, 2014)......................... 54

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*,
   774 F. Supp. 2d 596 (D. Del. 2011)............................................................... 22

*Oklahoma v. Purdue Pharma LP*,
   No. CJ-2017-816, 2019 WL 4019929 (Okla. Dist. Ct. Aug. 26, 2019) ................................... 53

*Superior Oil Co. v. Andrus*,
   656 F.2d 33 (3d Cir. 1981) ........................................................................................................ 49

*Totah v. Bies*,
   No. 10–CV–05956–CW, 2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) ................................... 54

*United States v. Philip Morris USA, Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................................... 62, 63

*United States v. Shell Oil Co.*,
   294 F.3d 1045 (9th Cir. 2002) ........................................................................................... 34, 35

*United States v. Sommerville*,
   324 F.2d 712 (3d Cir. 1963) ....................................................................................................... 9

*United States v. Standard Oil*,
   332 U.S. 301 (1947) .................................................................................................................... 9

*United States v. Swiss Am. Bank, Ltd.*,
   191 F.3d 30 (1st Cir. 1999) ........................................................................................................ 9

*Vaden v. Discover Bank*,
   556 U.S. 49 (2009) ..................................................................................................................... 7

*W. Va. ex rel. McGraw v. CVS Pharmacy, Inc.*,
   646 F.3d 169 (4th Cir. 2011) ...................................................................................... 19, 59, 60

*Washington v. Chimei Innolux Corp.*,
   659 F.3d 842 (9th Cir. 2011) ............................................................................................. 59, 60

*Washington v. Monsanto Co.*,
   274 F. Supp. 3d 1125 (W.D. Wash. 2017) ............................................................................... 55

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ........................................................................................................... *passim*

*Williams v. Emp'rs Mut. Cas. Co.*,
   845 F.3d 891 (8th Cir. 2017) ................................................................................................... 60

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985) ................................................................................................................. 57

**Statutes**

6 *Del. C.* § 2522 ............................................................................................................... 58, 59

10 U.S.C. §§ 7430(b)(1), (d), (g)(2) ........................................................................................ 44

20 U.S.C. § 1400 ....................................................................................................................... 15

28 U.S.C. § 1331 ........................................................................................................ 9, 10

28 U.S.C. § 1332(d)(1)(B) ................................................................................................ 58

28 U.S.C. § 1442 .................................................................................................... *passim*

28 U.S.C. § 1447(d) ......................................................................................................... 14

28 U.S.C. § 1453 ............................................................................................................... 2

29 *Del. C.* § 2504 ..................................................................................................... 58, 59

29 *Del. C.* § 2522 ..................................................................................................... 58, 59

42 U.S.C. § 6241(a), (d)(1) ............................................................................................ 46

42 U.S.C. § 7416 ............................................................................................................. 22

42 U.S.C. § 7604(e) ........................................................................................................ 22

42 U.S.C. § 9601 ............................................................................................................. 34

42 U.S.C. § 7604 ............................................................................................................. 22

42 U.S.C. § 7607 ............................................................................................................. 22

43 U.S.C. § 1331 ............................................................................................................... 2

43 U.S.C. § 1341(b) ........................................................................................................ 46

43 U.S.C. § 1349(b)(1) ............................................................................................... 3, 50

Class Action Fairness Act of 2005
  Pub. L. No. 109-2, 119 Stat. 4 § 2(a) (2005) .......................................................... 59

**Rules**

Fed. R. Civ. P. 12(b)(1) .................................................................................................. 61

Fed. R. Civ. P. 23 ............................................................................................... 3, 58, 59, 61

**Regulations**

10 C.F.R. § 626.4(a) ....................................................................................................... 46

30 C.F.R. § 250.105 ........................................................................................................ 41

## I.    NATURE AND STAGE OF THE PROCEEDINGS

On September 10, 2020, Plaintiff the State of Delaware ("the State") filed this action in the Superior Court of Delaware, asserting state-law claims for negligent failure to warn, trespass, nuisance, and violations of the Delaware Consumer Fraud Act. The State seeks redress for local injuries caused by Defendants' decades-long campaign to discredit the science of global warming, conceal the dangers posed by their fossil fuel products, and misrepresent their role in combatting the climate crisis. On October 23, 2020, Defendants removed this action to District Court, asserting seven grounds for federal jurisdiction. On November 5, 2020, the Court ordered a modification to the briefing schedules and page limits for the motion to remand pursuant to the parties' joint stipulation regarding same. On November 20, 2020, the State filed its Motion to Remand. The State now submits its Opening Brief in support of the Motion to Remand.

## II.    SUMMARY OF ARGUMENT

1.    Five district courts and four appellate courts have already rejected Defendants' attempts to remove substantially similar cases.[1] These cases considered and rejected each of the seven grounds for removal Defendants assert here: (1) federal common law, (2) *Grable* jurisdiction, (3) complete preemption, (4) federal enclave jurisdiction, (5) the federal officer removal statute,

---

[1] *See Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*") (granting remand), *as amended* (June 20, 2019), *aff'd in part, appeal dismissed in part*, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"), *cert. granted*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020); *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018) ("*San Mateo I*") (same), *aff'd in part, appeal dismissed in part*, 960 F.3d 586 (9th Cir. 2020) ("*San Mateo II*"), *reh'g en banc denied* (Aug. 4, 2020); *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020) (vacating order denying motion to remand) ("*Oakland*"); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019) ("*Boulder I*") (granting remand), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020) ("*Boulder II*"); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) ("*Rhode Island I*") (same), *aff'd in part, appeal dismissed in part*, 979 F.3d 50 (1st Cir. 2020) ("*Rhode Island II*"); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020) (granting remand).

1

28 U.S.C. § 1442, (6) the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*, and (7) the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1453.[2] Defendants' arguments fail for the specific reasons described below.

2.      Defendants cannot remove this case based on any federal common law for at least three reasons. First, federal common law does not provide an independent basis for removal jurisdiction apart from complete preemption and *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). Second, the areas of federal concern identified by Defendants have no relation to the claims alleged here. Third, to the extent a federal common law of interstate nuisance ever existed with respect to air pollution, it has been displaced by the Clean Air Act.

3.      This lawsuit does not satisfy any of the requirements for removal jurisdiction under *Grable*. The state-law claims at issue here do not "necessarily raise" any issue of federal law that is "actually disputed," because a determination of federal law is not an essential element of any claim. Nor are the federal questions that Defendants rely on "substantial"—rather, they are fact-bound and situation-specific, and do not turn on an issue of federal law that would be controlling in other cases. Finally, the federal-state balance supports remand because this is a case where the State seeks to enforce its own laws in its own courts.

4.      Complete preemption does not provide a basis for removing this case. The Clean Air Act does not create an exclusive federal cause of action that wholly displaces state law, much

---

[2] *Baltimore I*, 388 F. Supp. 3d 538 (rejecting jurisdiction based on federal common law, *Grable*, complete preemption, federal enclave, OCSLA, federal officer, and bankruptcy); *San Mateo I*, 294 F. Supp. 3d 934 (same); *Boulder I*, 405 F. Supp. 3d 947 (same); *Rhode Island*, 393 F. Supp. 3d 142 (same); *Massachusetts*, 462 F. Supp. 3d 31 (rejecting jurisdiction based on federal common law, complete preemption, *Grable*, federal officer, and CAFA); *Baltimore II*, 952 F.3d 452 (affirming grant of remand based on federal officer removal statute and dismissing appeal as to other grounds for removal); *San Mateo II*, 960 F.3d 586 (same); *Boulder II*, 965 F.3d 792 (same); *Rhode Island II*, 979 F.3d 50 (same); *Oakland*, 969 F.3d 895 (rejecting jurisdiction under federal common law, complete preemption, and *Grable*).

less one that would allow the State to vindicate the rights and interests at issue in this litigation. Nor can Defendants premise removal on the foreign affairs doctrine, as that *ordinary* preemption defense is wholly distinct from the jurisdictional doctrine of *complete* preemption.

5.     Removal under 28 U.S.C. § 1442 is improper because there is no federal officer jurisdiction. First, there is no plausible connection between the State's claims and the activities Defendants purportedly performed under a federal officer. Second, Defendants did not act on behalf of the federal government, nor did their relationship with a federal superior involve subjection, guidance, or control.

6.     Jurisdiction under the OCSLA is lacking here because this case does not "aris[e] out of, or in connection with," any operation conducted on the outer continental shelf ("OCS"), as required by the statute. 43 U.S.C. § 1349(b)(1). Defendants' concealment and misrepresentation of their products' known dangers is not an "operation" conducted on the OCS, nor are Defendants' activities on the OCS a but-for cause of the State's injuries.

7.     There is no federal enclave jurisdiction here because for enclave purposes the State's claims "arise" only when and where the State suffered injuries, and the State disclaims injuries on federal land. Additionally, even assuming *arguendo* that some tortious conduct relevant to the State's claims did occur on federal enclaves, federal jurisdiction still does not apply because most of the tortious conduct at issue here occurred outside of enclaves, and Defendants have not met their burden of proving otherwise.

8.     CAFA does not authorize removal of this case. Because the state laws under which this case was filed bear no resemblance to Federal Rule of Civil Procedure 23, this case does not qualify as a "class action" within the meaning of CAFA.

9.      The plausibility of the State's deception allegations is a merits issue that should not be decided on a motion to remand. In any event, these attacks on the merits fail because Defendants cannot avoid liability for their decades-long deception campaign simply by identifying other actors who did not engage in such misconduct but, instead, published accurate information about the existential threat of global warming.

## III.   STATEMENT OF FACTS

The State sued Defendants in Delaware state court, asserting state-law claims for (1) negligent failure to warn, (2) trespass, (3) nuisance, and (4) violations of the Delaware Consumer Fraud Act. *See* Ex. 1, D.I. 1-1 at ¶¶ 234–80 (Complaint, hereinafter "Compl). The State's claims rest on Defendants' decades-long campaign to deceive and mislead the public and consumers about the devastating impacts of climate change and its link to fossil fuels, which led to disastrous impacts caused by profligate and increased use of Defendants' products. *See, e.g.*, *id*. ¶¶ 1–12.

For more than half a century, Defendants have known that their oil, gas, and coal products create greenhouse gas pollution that changes the climate, warms the oceans, and causes sea levels to rise. *Id*. ¶¶ 1, 7, 62–103. Starting as early as the 1950s, Defendants researched the link between fossil fuel consumption and global warming, amassing a remarkably comprehensive and nuanced understanding of the adverse climate impacts caused by their fossil fuel products. *Id*. ¶¶ 62–64. In widely circulated internal reports and communications, their own scientists predicted that the unabated consumption of fossil fuels would cause "dramatic environmental effects," warning that the world had only a narrow window of time to curb emissions and stave off "catastrophic" climate change. *Id*. ¶¶ 76, 80, 85, 88. Defendants took these warnings seriously: they evaluated impacts of

4

climate change on their infrastructure, invested to protect assets from rising seas and more extreme storms, and developed technologies to profit off a warmer world. *See id*. ¶¶ 142–47.

But when the United States and other countries began to treat climate change as a grave threat requiring concerted action, Defendants embarked on a campaign of denial and disinformation about the existence, cause, and adverse effects of global warming. *See id*. ¶¶ 104–41. Among other tactics, Defendants (1) bankrolled contrarian climate scientists whose views conflicted not only with the overwhelming scientific consensus, but also with Defendants' internal understanding of global warming; (2) funded think tanks, front groups, and dark money foundations that peddled in climate change denialism; and (3) spent millions of dollars on newspaper ads, radio commercials, and mailers that casted doubt on the science of climate change. *See id*.

When public awareness finally started catching up to Defendants' own knowledge of the serious dangers posed by their fossil fuel products, Defendants pivoted to a new deceptive strategy: "greenwashing." *Id*. ¶¶ 161–210. They advertise, for example, that certain fossil fuel products are "green" or "clean," while failing to warn that the very production and use of those products is the leading cause of climate change. *Id*. ¶¶ 161, 163. They falsely portray themselves as environmentally conscious companies that invest heavily in renewable energy sources, even though they devote negligible investments to low-carbon energy and continue to develop new fossil fuel resources and ramp up production. *Id*. ¶¶ 164, 166.

Now and in the years to come, the State bears the costs of Defendants' deception and disinformation. *See id*. ¶¶ 226–33. The State, which has the lowest mean elevation in the nation, has already experienced over one foot of sea level rise and will experience significant additional and accelerating sea level rise over the coming decades—even if all combustion of fossil fuels ended today. *Id*. ¶ 228(a). Sea level rise has and will put thousands of Delaware residents at risk for

coastal flooding. *Id*. It will damage or diminish State property and public infrastructure such as roadways, natural resources, and beaches. *Id*. Saltwater intrusion into groundwater will potentially contaminate the State's drinking water supply and affect its agricultural industry. *Id*. Ocean acidification, driven by fossil fuel burning, risks destabilizing Delaware industries that are closely intertwined with its coastal waters, saltwater wetlands, bays, and estuaries. *Id*. ¶ 228(d). Warming air temperatures will lead to more extreme heat days, poor air quality, expanded pathogen and pest ranges, and impacts on agricultural production, among others. *Id*. ¶ 228(e).

The State has already incurred, and will continue to incur, significant expenses to mitigate these climate impacts, which have been caused by Defendants' decades-long campaign of denial and disinformation about the existence of climate change and their products' contribution to it. *Id*. ¶ 231. To redress these local harms, the State sued Defendants in Delaware Superior Court. The suit does not seek to limit the extraction of fossil fuels or otherwise regulate greenhouse gas emissions. Rather, the State seeks damages for the harms that it has already incurred—and for the costs of abating and mitigating the harms that it will suffer—as a result of Defendants' tortious conduct, including its campaign to mislead and conceal the dangers of their fossil fuel products. *See id.* ¶¶ 12, 15, Prayer for Relief.

Defendants filed their Notice of Removal on October 23, 2020, alleging seven grounds for federal subject matter jurisdiction. *See* Notice of Removal, D.I. 1 ("NOR").

## IV.   ARGUMENT

### A.   Legal standard

Federal courts are "courts of limited jurisdiction" in that "[t]hey possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005). "The federal removal statute" is therefore "strictly construed, requiring remand if any doubt

exists over whether removal was proper." *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 218 (3d Cir. 2015). Critically, "the party asserting federal jurisdiction in a removal case bears the burden of showing, at all stages of the litigation, that the case is properly before the federal court." *Frederico v. Home Depot*, 507 F.3d 188, 193 (3d Cir. 2007). The presumption against removal jurisdiction is even higher in actions brought by a state exercising its sovereign authority to enforce its own laws. *See Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983).

Under the cardinal "well-pleaded complaint rule," "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (quotations omitted). The rule "makes the plaintiff the master of the claim" because, in drafting the complaint, the plaintiff may choose to "avoid federal jurisdiction by exclusive reliance on state law." *Id.* It is a "powerful doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court." *Franchise Tax Bd.*, 463 U.S. at 9–10. A close corollary to the well-pleaded complaint rule is that "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law, whether anticipated by the plaintiff in the complaint, or asserted by the defendants in the notice of removal. *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009).

**B.    Federal common law is not a basis for removal.**

Federal common law provides no basis for removal for at least three reasons. First, and most fundamentally, federal common law cannot provide an independent basis for removal jurisdiction apart from complete preemption and *Grable* analysis. Second, the various areas of federal concern Defendants identify simply have nothing to do with the State's Complaint, which rests on traditional failure to warn, trespass, nuisance, and consumer fraud claims under Delaware law. Third,

7

Defendants misconstrue controlling precedent in asserting that the federal common law of interstate nuisance "governs" or preempts every state-law case involving climate change. The opposite is true. To the extent such federal common law ever existed with respect to air pollution, the Supreme Court has expressly stated that it has been displaced by the Clean Air Act ("CAA"), and "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal [CAA]." *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 429 (2011) ("*AEP*").

Ultimately, "only limited areas exist in which federal judges may appropriately craft the rule of decision," which historically "have included admiralty disputes and certain controversies between States." *Rodriguez v. Fed. Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020). "In the absence of congressional authorization," therefore, "[federal] common lawmaking must be 'necessary to protect uniquely federal interests.'" *Id.* There are no "uniquely federal interests" at stake in the State's action to enforce Delaware tort laws against Defendants.

**1. Federal common law cannot provide an independent basis for removal.**

First, the State's claims do not arise under federal common law because the two relevant exceptions to the well-pleaded complaint rule (*Grable* and complete preemption) are not satisfied, and there is no other avenue for subject-matter jurisdiction based on federal common law. Defendants "fail to cite any Supreme Court or other controlling authority authorizing removal based on state-law claims implicating federal common law," because there is none.[3] *Boulder I*, 405 F. Supp. 3d at 963.

---

[3] Defendants rely on *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018), NOR ¶ 18, but that decision dealt with a motion to dismiss for failure to state a claim—which only reinforces that Defendants' arguments constitute defenses, not a basis for jurisdiction. The court did not consider whether federal common law conferred federal question jurisdiction because the plaintiff originally filed its complaint in federal court based on diversity jurisdiction.

Defendants' assertion that a wholly state-law case like the State's is removable because "the substance of the complaint's allegations and demands for relief reveal that those claims are exclusively federal by virtue of the structure of our Constitution," NOR ¶ 19, is nonsensical. The Supreme Court's purpose in the *Grable* line of cases was "to bring some order to th[e] unruly doctrine" that had developed to determine when a state law claim arises under federal law for removal purposes. *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see id.* ("[W]e do not paint on a blank canvas. Unfortunately, the canvas looks like one that Jackson Pollock got to first."). That is why the Ninth Circuit in *Oakland* rejected the district court's conclusion "that it had federal-question jurisdiction under 28 U.S.C. § 1331 because the [plaintiffs]' claim was 'necessarily governed by federal common law,'" 969 F.3d at 902, holding that "because neither exception to the well-pleaded-complaint rule [*Grable* jurisdiction or complete preemption] applies to the [plaintiffs]' original complaints, the district court erred in holding that it had jurisdiction," *id.* 908. The Ninth Circuit did not analyze the plaintiffs' complaints under a third exception for state-law claims "governed by" federal common law, because there is no such exception. This Court must decline Defendants' invitation to return to the "muddled backdrop" against which the *Grable* test was crafted. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1571 (2016).[4]

---

[4] Defendants' reliance on *United States v. Standard Oil*, 332 U.S. 301 (1947), *United States v. Sommerville*, 324 F.2d 712 (3d Cir. 1963), and *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30 (1st Cir. 1999), recreates the confusion *Grable* sought to resolve. All three of those cases were brought by the United States *in federal court* in the first instance. None of those case involved removal jurisdiction (or subject-matter jurisdiction at all), none involved claims pleaded under state law, and none involved a state plaintiff. Each instead ruled on a choice of law question, namely: whether the federal government's tort claims against private defendants were cognizable under state or federal law. The cases simply say nothing relevant about the removability of well-pleaded state law claims.

## 2.  This case has nothing to do with any body of federal common law.

The Complaint also cannot be removed based on federal common law because this case has no relationship to regulating "interstate or international pollution," NOR ¶¶ 16–23; "the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause," *id.* ¶¶ 24–27; "the navigable waters of the United States," *id.* ¶ 28; or any other purported uniquely federal interest. The Ninth Circuit in *Oakland* flatly rejected these theories for removal on the merits. *See* 969 F.3d at 906–07. As here, the defendants in *Oakland* argued that the plaintiffs' Complaint "implicates a variety of 'federal interests,' including energy policy, national security, and foreign policy." *Id.* The Ninth Circuit found these arguments did not justify removal since they "d[id] not raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *Id.* at 907.

Likewise, in *Massachusetts*, the district court remanded a consumer-protection action brought by the Massachusetts Attorney General, declining to find jurisdiction based on a purported relationship to federal common law, because the claims were simply unrelated to any uniquely federal concerns:

> [T]he Commonwealth wants "to hold ExxonMobil accountable for misleading the state's investors and consumers." No one doubts that this task falls within the core of a state's responsibility. States routinely enforce consumer protection and securities laws alongside the federal government. Nor has ExxonMobil provided any reason why protecting Massachusetts consumers and investors from fraud implicates "uniquely federal interests." It does not.

462 F. Supp. 3d at 43–44 (citations omitted); *accord San Mateo I*, 294 F. Supp. 3d at 937*; Rhode Island I*, 393 F. Supp. 3d at 148–50*; Baltimore I*, 388 F. Supp. 3d at 554–58; *Boulder I*, 405 F. Supp. 3d at 957–64.

The same analysis and result apply here. The State's case "seeks to ensure that the parties who have profited from externalizing the consequences and costs of dealing with global warming

and its physical, environmental, social, and economic consequences, bear the costs of those impacts on Delaware, rather than the State, taxpayers, residents, or broader segments of the public." Compl. ¶ 15. The State does not seek to regulate emissions, solve the countless environmental problems stemming from climate change, or usurp control over energy policy in every country on earth. There is no basis to presume that Congress intended to subsume state common-law claims for failure to warn, trespass, and nuisance into judge-made federal law concerning interstate pollution, federal waterways, or foreign policy.

### 3. The federal common law of interstate greenhouse gas emissions, if it ever existed, has been displaced by the Clean Air Act.

In addition to the flaws already discussed, Defendants' federal common law theory fails because the CAA displaced whatever federal common law might once have related to greenhouse gas emissions. The Supreme Court and Ninth Circuit have rejected Defendants' assertion that federal common law governs every state law claim that touches on global warming. *See AEP*, 564 U.S. at 429; *Oakland*, 969 F.3d at 906 ("[T]he Supreme Court has not yet determined that there *is* a federal common law of public nuisance relating to interstate pollution," because "*federal* public-nuisance claims aimed at imposing liability on energy producers" for climate crisis injuries "are displaced by the Clean Air Act." (emphases added)).

Defendants misread *AEP* and *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012). In *AEP*, the plaintiffs sued five electric power companies in federal court, alleging the companies' greenhouse gas emissions violated the federal common law of interstate nuisance or, in the alternative, state tort law. 564 U.S. at 418. The Supreme Court concluded, however, that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants" because it was "plain that the Act 'speaks directly' to emissions of carbon dioxide from the defendants' plants." *Id.* at

11

424. It was thus an "academic question whether, in the absence of the [CAA] . . . , the plaintiffs could state a federal common-law claim for curtailment of greenhouse gas emissions because of their contribution to global warming"; if ever such a cause of action existed, it did not survive the CAA. *Id.* at 423. The Court expressly reserved the question of whether the plaintiffs' *state* nuisance claims remained viable, "leav[ing] the matter open for consideration on remand." *Id.* at 429. *See San Mateo I*, 294 F. Supp. 3d at 937 ("Far from holding (as the defendants bravely assert) that state law claims relating to global warming are superseded by federal common law, the Supreme Court noted that the question of whether such state-law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve).").

The *Kivalina* plaintiff also pleaded claims under federal common law in federal court in the first instance, and the Ninth Circuit simply applied the "direct Supreme Court guidance" in *AEP* that "Congress has directly addressed the issue of domestic greenhouse gas emissions from stationary sources and has therefore displaced federal common law." 696 F.3d at 856. The plaintiff had originally pleaded state law claims, but did not appeal the district court's decision not to exercise supplemental jurisdiction over the state law claims after dismissing the federal common law claims. *Id.* at 854–55.

Nothing in either *AEP* or *Kivalina* stands for the proposition that every state law claim touching on climate change is transmuted into a federal claim by independent operation of federal common law, and is thus removable. To the extent a federal common law of interstate greenhouse gas emissions ever existed, it was displaced by the CAA, and therefore cannot provide a basis for removal. "Simply put, th[is] case[ ] should not have been removed to federal court on the basis of federal common law that no longer exists." *San Mateo I*, 294 F. Supp. 3d at 937.

**C.      There is no *Grable* jurisdiction because the Complaint does not "necessarily raise" any substantial, disputed federal questions.**

A state law claim arises under federal law for *Grable* purposes "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158, 163 (3d Cir. 2014), *aff'd*, 136 S. Ct. 1562 (2016) (quoting *Gunn*, 568 U.S. at 258). "Only a 'slim category' of cases satisfy the *Grable* test," *id.* (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006)), and this lawsuit is not among them.

None of the four elements of the *Grable* test are satisfied here. The State's Delaware law claims do not "necessarily raise" any question of federal law, "disputed" or otherwise. Defendants' Notice of Removal describes an encyclopedia of federal topics that will allegedly come up in the course of litigation, from Congress's 1845 assertion of maritime jurisdiction over "certain cases upon lakes," NOR ¶¶ 158–60, to petroleum import quotas imposed under President Eisenhower, *id.* ¶ 172. But each of these issues, if they come into play at all, "arises out of a defense, and is not an essential element of [the State's] claims," and thus does not satisfy *Grable*. *See Parlin v. DynCorp Int'l, Inc.*, 579 F. Supp. 2d 629, 634 (D. Del. 2008). Moreover, none of the various federal matters Defendants rely on are "substantial" under *Grable*, because they are not "importan[t] . . . to the federal system as a whole." *Gunn*, 568 U.S. at 260. Finally, the "federal-state balance approved by Congress," *id.* at 258, favors the State's ability to litigate claims under Delaware law in Delaware courts.

Five district courts in four circuits have considered Defendants' *Grable* arguments in state-law tort cases alleging that fossil-fuel-industry defendants misrepresented their products' dangers, and all five granted remand. *See Baltimore I*, 388 F. Supp. 3d at 558–61; *Boulder I*, 405 F. Supp.

13

3d at 964–68; *San Mateo I*, 294 F. Supp. 3d at 938; *Rhode Island I*, 393 F. Supp. 3d at 150–51; *Massachusetts*, 462 F. Supp. 3d at 44–45.[5] The Ninth Circuit, in vacating the lone denial of remand based on the relationship between climate-related injuries and federal law, also rejected *Grable* jurisdiction. *Oakland*, 969 F.3d at 906–07. Thus, "[e]very court to consider the question has rejected the oil-industry defendants' arguments for *Grable* jurisdiction" in analogous cases. *Massachusetts*, 462 F. Supp. 3d at 45. Defendants' arguments must be rejected here, too.

### 1. The Complaint does not necessarily raise any issue of federal law that is actually disputed.

Defendants' jumble of theories for *Grable* jurisdiction all fail the test's first prong because no federal issue is necessarily raised by any of the State's claims. "For a federal issue to be necessarily raised" under *Grable*, "'vindication of a right under state law [must] necessarily turn[ ] on some construction of federal law.'" *Manning*, 772 F.3d at 163 (quoting *Franchise Tax Bd.*, 463 U.S. at 9). Stated differently, a federal question is necessarily raised only "when the determination of federal law is an essential element of the plaintiff's state law claim." *Delaware ex rel. Denn v. Purdue Pharma L.P.*, No. CV 1:18-383-RGA, 2018 WL 1942363, at *2 (D. Del. Apr. 25, 2018); *Oakland*, 969 F.3d at 904. *Grable* analysis must still adhere to the well-pleaded complaint rule, and thus "a federal question [that] is inherent in a potential *defense* rather than in the plaintiff's *cause*

---

[5] The First, Fourth, Ninth, and Tenth Circuits affirmed the remand orders in *Rhode Island I*, *Baltimore I*, *San Mateo I*, and *Boulder I*, respectively, but did not reach the *Grable* issue. Each court held that its appellate jurisdiction was limited to reviewing whether Defendants' removal on federal officer grounds was proper. *See Rhode Island II*, 979 F.3d at 58–59; *Baltimore II*, 952 F.3d at 461; *San Mateo II*, 960 F.3d at 598; *Boulder II*, 965 F.3d at 813; *see also* 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise."). Each court also affirmed remand based on the lack of federal officer jurisdiction. *See* Part IV.E, *infra*. The Ninth Circuit did reach the question of *Grable* jurisdiction in *Oakland* and reversed the district court's denial of remand, finding *Grable* not satisfied. *See Oakland*, 969 F.3d at 906–07.

*of action*," is not "necessarily raised." *Parlin*, 579 F. Supp. 2d at 633 (emphasis added). No element of the State's *prima facie* case on any of its claims turns on federal law, and all Defendants' arguments present, at most, federal defenses.

Defendants studiously avoid articulating the issues they identify as federal defenses, but that is what they are. Defendants first argue that "Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act . . . and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses," NOR ¶ 145, and that the State's nuisance claim will require a state court to second guess those agency determinations. *See id.* ¶¶ 146–54. The Complaint, however, does not challenge or seek to overturn any federal law, rule, or program. It does not claim that Defendants are liable for violating any federal law, and it neither directly nor indirectly seeks any relief from any federal agency. Thus, when Defendants complain that "emissions have been extensively regulated nationwide by the federal government under the Clean Air Act," *id.* ¶ 151 (quotations omitted), what they mean but cannot say is that in their view the Clean Air Act and its implementing regulations preempt the State's nuisance claims. That is plainly insufficient to confer jurisdiction.

The cases Defendants cite illustrate that *Grable* jurisdiction is inappropriate here. In *M.K. by & through Barlowe K. v. Prestige Academy Charter School*, 302 F. Supp. 3d 626 (D. Del. 2018), the court held that subject matter jurisdiction existed under *Grable* in a breach of contract action against the Delaware Department of Education. The contract in question was a settlement agreement with a defunct charter school that resolved alleged violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, and the "sole question on the face of every count" of the complaint was whether the plaintiffs could enforce the IDEA settlement against the State after the school ceased operations. *Id*. at 634. The court thus found *Grable* jurisdiction

15

"unusually straightforward" because the plaintiffs "brought suit to enforce rights conferred by a federal statute," which they alleged the State was obliged to satisfy; the plaintiffs did "not merely mention the IDEA, but premise[d] all their claims upon it." *Id.* at 633–34. The State's allegations bear no resemblance to those in *Prestige Academy*.

Defendants' other citations are equally inapposite. In *Board of Commissioners v. Tenn. Gas Pipeline Co.*, the Fifth Circuit held federal questions were necessarily raised because the plaintiff's negligence and nuisance claims "dr[ew] on federal law as the exclusive basis" for liability for the defendant's conduct, and could not be resolved "without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law." 850 F.3d 714, 722–23 (5th Cir. 2017). Here, all the duties and standards the State seeks to enforce are created by Delaware law. *See* Compl. ¶¶ 234–80 (setting forth state-law causes of action only), Prayer for Relief. In *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, federal questions were necessarily raised because the plaintiff expressly alleged that a stock borrowing program approved and regulated by the Securities and Exchange Commission, "*by its mere existence*, hinder[ed] competition" in violation of state antitrust laws, and the complaint thus "directly implicate[d] actions taken" by the SEC in approving and regulating the program. 559 F.3d 772, 778–79 (8th Cir. 2009). There is no similar allegation here that any federal program caused the State's injuries. In *Bennett v. Southwest Airlines Co.*, the Seventh Circuit held that federal questions were *not* necessarily raised in a set of negligence claims arising out of a plane crash, despite "the dominant role that federal law plays in air transport." 484 F.3d 907, 909 (7th Cir. 2007). The court expressly rejected the defendants' argument that "*all* suits about commercial air travel belong in federal court because the national government is the principal source of rules about safe air transportation, and uniform application of these norms is desirable." *Id.* Because the actual negligence duties allegedly owed by the defendants

16

derived entirely from state law, the court declined to hold "that the national regulation of many aspects of air travel means that a tort claim in the wake of a crash 'arises under' federal law." *Id.* at 912 (citing *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 375–76 (3d Cir. 1999)). Defendants' arguments here are essentially the same as those rejected in *Bennett*: that because various matters concerning air quality, navigation, and fossil fuels are federally regulated, all state law causes of action touching on those subjects necessarily raise federal questions. That argument is equally baseless here.

The jumble of other assertions about navigable waters, foreign affairs, federal common law, the First Amendment, Due Process, the Kyoto Protocol, the Clean Water Act, and more, *see, e.g.*, NOR ¶¶ 145, 156, all fail for the same reason: they are, at most, federal defenses. Substantively identical arguments in similar climate-related cases have all been rejected.[6] The district court's decision in *Rhode Island I* is particularly salient. There, the court granted that state's motion to remand, rejecting the same *Grable* arguments Defendants raise here. Rhode Island, like the State here, brought state-law claims including for nuisance, failure to warn, and trespass, alleging that the fossil fuel company defendants misled the public about the known dangers of their products. *Rhode Island I*, 393 F. Supp. 3d at 146. The district court had little difficulty determining those

---

[6] *Oakland*, 969 F.3d at 906–07 & n.12 (rejecting reliance on federal issues "including energy policy, national security, and foreign policy," as well as the argument that navigable waters are the "instrumentality of the alleged harm"); *San Mateo I*, 294 F. Supp. 3d at 938 ("The mere potential for foreign policy implications . . . does not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction. Nor does the mere existence of a federal regulatory regime mean that these cases fall under *Grable*."); *Baltimore I*, 388 F. Supp. 3d at 559–61 (foreign affairs, regulatory balancing, navigable waters, federal disclosure obligations); *Boulder I*, 405 F. Supp. 3d at 965–67; (foreign affairs, regulatory balancing); *Rhode Island I*, 393 F. Supp. at 151 (foreign affairs, federal regulations, navigable waters); *see also Massachusetts*, 462 F. Supp. 3d at 44 ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's [consumer and investor fraud] allegations do not require any forays into foreign relations or national energy policy.").

were "thoroughly state-law claims," because "[t]he rights, duties, and rules of decision implicated by the complaint are all supplied by state law, without reference to anything federal." *Id.* at 151. The defendants' reliance on "foreign affairs, federal regulations, and the navigable waters of the United States" previewed issues that the defendants "may press in the course of th[e] litigation, but that are not perforce presented by [Rhode Island's] claims." *Id.* Those topics were, "if anything, premature defenses, which even if ultimately decisive, cannot support removal." *Id.* So too here.

> ### 2. The federal questions Defendants rely on are not "substantial," and the federal-state balance favors adjudication of these Delaware-law claims in Delaware's own courts.

Even if Defendants could show a federal question is necessarily raised, none would be considered "substantial" under *Grable*. The substantiality inquiry looks to the importance of a federal issue "to the federal system as a whole." *Gunn*, 568 U.S. at 260. "An issue has such importance when it raises substantial questions as to the interpretation or validity of a federal statute, or when it challenges the functioning of a federal agency or program." *Oakland*, 969 F.3d at 905 (citation omitted). A question may also be "substantial" when it presents "a 'pure issue of law,' that directly draws into question 'the constitutional validity of an act of Congress,' or challenges the actions of a federal agency, and a ruling on the issue is 'both dispositive of the case and would be controlling in numerous other cases.'" *Id.* (citations omitted). "By contrast, a federal issue is not substantial if it is 'fact-bound and situation-specific,'" "or raises only a hypothetical question unlikely to affect interpretations of federal law in the future." *Id.* (citations omitted); *see also Purdue Pharma*, 2018 WL 1942363, at *4.

The State's claims do not challenge a federal statute or agency program, and they do not turn on a "dispositive," "pure" issue of federal law that "would be controlling" in other cases. Instead, they raise only state-law issues that are highly "fact-bound and situation-specific," and any connection to future questions of federal law is "hypothetical." *See Oakland*, 969 F.3d at 907

18

(whether fossil fuel companies can be held liable under California nuisance law "is no doubt an important policy question, but it does not raise a substantial question of federal law"); *Boulder I*, 405 F. Supp. 3d at 968 (no substantiality where "the issues raised by Defendants are not central to Plaintiffs' claims, and the claims are 'rife with legal and factual issues that are not related' to the federal issues"). Contrary to Defendants' arguments, the State's failure-to-warn, trespass, and nuisance claims simply have nothing to do with energy regulations, foreign policy, or national security.

Finally, the "federal-state balance approved by Congress" also supports remand. *Manning*, 772 F.3d at 163. Where, as here, the State seeks to enforce its own laws and protect public rights within its traditional police authority within its own courts, federalism concerns weigh strongly in favor of adjudication in state court. *See Franchise Tax Bd.*, 463 U.S. at 21 n.22 ("[C]onsiderations of comity make [courts] reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it."). Indeed, when a state brings an "action in state court" and "alleges only state law causes of action, brought to protect [its own] residents . . . . the 'claim of sovereign protection from removal arises in its most powerful form.'" *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012) (quoting *W. Va. ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011)) (finding no jurisdiction under *Grable* and reversing denial of motion to remand). In sum, none of *Grable*'s four elements are satisfied here.

**D.      The Complaint's state-law claims are not completely preempted.**

Defendants also argue that this Court has jurisdiction because the CAA and the foreign affairs doctrine completely preempt the State's claims. Neither provides a basis for removal, however, as every court to consider the issue has concluded in similar cases. *See Oakland*, 969 F.3d at 907–08; *Boulder I*, 405 F. Supp. 3d at 968–73; *Baltimore I*, 388 F. Supp. 3d at 561–63; *Rhode*

*Island I*, 393 F. Supp. 3d at 148–50; *San Mateo I*, 294 F. Supp. 3d at 937–38; *Massachusetts*, 462 F. Supp. at 41–42.

As an initial matter, Defendants "impermissibly attempt[] to create the prerequisites for [complete preemption] removal" by mischaracterizing the contents of the Complaint. *See Caterpillar Inc.*, 482 U.S. at 396–97. This lawsuit does *not*—as Defendants assert—aim "to regulate nationwide emissions" or "to review the actions of the EPA." NOR ¶¶ 183, 188. Rather, it seeks to hold Defendants accountable under Delaware law for their decades-long campaign to deceive consumers and the public about the dangers of their fossil fuel products. *See, e.g.*, Compl. ¶¶ 8, 12–13. Nor does the State "request[] relief that would alter or amend the rules regarding interstate—and even international—regulation of greenhouse gas emissions." NOR ¶ 177. Instead, it seeks merely to abate (*i.e.*, prevent) the local harms caused by Defendants' tortious conduct, relief that Defendants can provide without curbing their fossil fuel production and sales. *See, e.g.*, Compl. ¶ 231 (documenting the State's "adaptation and mitigation strategies to address climate change-related impacts"). The Court should therefore disregard Defendants' straw-man attacks, as other courts have done in analogous cases. *See, e.g.*, *Baltimore II*, 952 F.3d at 467 ("[R]eferences to fossil fuel production in the Complaint . . . [are] not the source of tort liability."); *Boulder I*, 405 F. Supp. 3d at 969 ("Defendants mischaracterize Plaintiffs' claims."); *Massachusetts*, 462 F. Supp. 3d at 44 ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's allegations do not require any forays into foreign relations or national energy policy."); *Baltimore I*, 388 F. Supp. 3d at 560 ("This argument rests on a mischaracterization of the City's claims.").

In any event, this case does not satisfy the two requirements of complete preemption. First, a defendant must identify an "exclusive [federal] cause of action" that "wholly displaces" any state causes of action falling within its scope. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8, 9 & n.5

(2003). This condition is "rare[ly]" met, *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1204 (10th Cir. 2012), as it requires evidence of "clear" congressional intent to make a federal remedy exclusive, *Metro. Edison Co. v. Penn. Pub. Util. Comm'n*, 767 F.3d 335, 363 (3d Cir. 2014); *see also Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987).[7] Indeed, the Supreme Court has been avowedly "reluctant to find th[e] extraordinary pre-emptive power" required for complete preemption, identifying only three statutes to date (none at issue here) whose "pre-emptive force . . . is so powerful as to displace entirely any state cause of action." *Metro. Life Ins.*, 481 U.S. at 64–65 (quotations omitted).[8]

Second, a defendant must show that a plaintiff's state-law claims "fall within the scope of" the exclusive federal cause of action. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 211 (2004) (quotations omitted); *see also Franchise Tax Bd.*, 463 U.S. at 24–25. It is not enough—as Defendants suggest—that the two causes of action concern similar subject matter. Instead, the federal cause of action must "vindicat[e] the same interest the plaintiff's state cause of action seeks to vindicate." *Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R. Co.*, 858 F.2d 936, 942 (3d Cir. 1988); *see also Goepel*, 36 F.3d at 313. It must, in other words, serve as "a substitute cause of action

---

[7] Before 2003, the Third Circuit's complete preemption analysis looked for "a clear indication of a Congressional intention to permit removal." *Goepel v. Nat'l Postal Mail Handlers Union, a Div. of LIUNA*, 36 F.3d 306, 311 (3d Cir. 1994). In *Beneficial National Bank*, however, the Supreme Court clarified that "the proper inquiry focuses on whether Congress intended the federal cause of action to be exclusive rather than on whether Congress intended that the cause of action be removable." 539 U.S. at 9 n.5. The Third Circuit has not revisited its formulation of the complete preemption test since *Beneficial National Bank*. But regardless of how the standard is articulated, Defendants fail to meet it because they offer no evidence that Congress intended—much less clearly intended— to federalize or make removable the state-law claims prosecuted in this case.

[8] Those three statutes are: Section 301 of the Labor Management Relations Act, Section 502(a) of the Employment Retirement Income Security Act, and Sections 85 and 86 of the National Bank Act. *See New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

. . . that would allow the [plaintiff] to remedy the wrong [it] assert[s] [it] suffered." *Oakland*, 969 F.3d at 908 (cleaned up).

The CAA, as applied to this case, fails both prongs of the complete preemption test. Although the CAA creates various private causes of action, *see* 42 U.S.C. §§ 7604, 7607, "the statutory language does not indicate that Congress intended to preempt every state law cause of action within the scope of [those provisions]." *Oakland*, 969 F.3d at 907 (quotations omitted). Indeed, Congress signaled just the opposite when it declared that "[n]othing in" the chapter of the CAA governing citizen suits "shall restrict any right which any person (or class of persons) may have under any statute or common law . . . to seek any other relief." 42 U.S.C. § 7604(e). By including "a saving clause of this sort," Congress made clear that it "did not intend complete preemption, because there would be nothing to save if Congress intended to preempt every state cause of action within the scope of the statute." *Oakland*, 969 F.3d at 908 (cleaned up); *see also, e.g., Johnson v. Am. Towers, LLC*, 781 F.3d 693, 703 (4th Cir. 2015) ("[T]his savings clause counsels against a finding that Congress intended to sweep aside all state claims in a particular area."); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 604 (D. Del. 2011) (same); *Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc.*, 958 F. Supp. 947, 958 (D. Del. 1997) (same).

Other provisions of the CAA bolster this conclusion. Section 7401(a)(3), for example, declares that "air pollution control at its source is the primary responsibility of States and local governments." And in yet another savings clause of the CAA, Congress expressly preserved "the right [of states] to 'adopt or enforce' common law standards that apply to emissions." *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690 (6th Cir. 2015) (quoting 42 U.S.C. § 7416). "A statute that goes so far out of its way to preserve state prerogatives cannot be said to be an expression

of Congress's 'extraordinary pre-emptive power' to convert state-law into federal-law claims." *Rhode Island I*, 393 F. Supp. 3d at 150; *see also Her Majesty The Queen In Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 342–43 (6th Cir. 1989) (denying removal based on complete preemption because "the plain language of the CAA's savings clause . . . . clearly indicates that Congress did not wish to abolish state control").

At any rate, none of the State's claims fall within the scope of a federal cause of action created by the CAA. In their removal petition, Defendants focus on the statutory right to petition the Environmental Protection Agency (the "EPA") to create or modify "nationwide emission standards." NOR ¶ 181. But the State's claims in this lawsuit are nothing like a petition for rulemaking: they target different defendants (the fossil fuel industry, not the EPA); they are premised on entirely different types of misconduct (consumer deception campaigns, not improper emissions standards); and they seek different types of relief (damages and nuisance abatement, not specific regulatory standards). Indeed, the wrongful conduct that lies at the heart of this lawsuit— unlawfully concealing and misrepresenting the known dangers of fossil fuels, while simultaneously promoting their unrestrained use, sale, and production—is of *no* concern to the CAA, much less a "central concern." *Franchise Tax Bd.*, 463 U.S. at 25–26 (no complete preemption because "the State's right to enforce its tax levies is not of central concern to [ERISA]"). And because none of the CAA's citizen-suit provisions "vindicate the same basic right or interest" that the State seeks to vindicate in this litigation, *Devon Energy Prod.*, 693 F.3d at 1207, the CAA does not completely preempt the State's claims for violations of Delaware law, *see Oakland*, 969 F.3d at 908 (concluding that "the Clean Air Act does not provide the Cities with a substitute cause of action" (cleaned up)).

The Court can also make quick work of Defendants' passing reference to the foreign affairs doctrine. *See* NOR ¶ 179.[9] As explained above, the hallmark of complete preemption is a federal cause of action that Congress clearly intended to be exclusive. The foreign affairs doctrine, however, does not create a cause of action, and it does not derive from congressional intent. *See Boulder I*, 388 F. Supp. 3d at 562 (making the same observations). Instead, it articulates an *ordinary* preemption defense based on "the 'executive Power' vested in Article II of the Constitution." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003); *see also id.* at 419–20 (framing the doctrine in terms of "field and conflict preemption"). Defendants therefore improperly conflate ordinary and complete preemption when they rely on the foreign affairs doctrine as a basis for removal. *See Metro. Edison*, 767 F.3d at 362–63 (cautioning that the doctrines of ordinary and complete preemption are "jurisprudentially distinct" and not to be confused with one another).

Moreover, even if the foreign affairs doctrine were relevant to removal jurisdiction, it would not apply in this case. To determine whether state law is preempted by the Executive Branch's conduct of foreign affairs, courts generally balance two factors: (1) whether the state law conflicts with "an express foreign policy of the National Government," and (2) whether the state law falls within an area of "traditional [state] competence." *Garamendi*, 539 U.S. at, 420; *see also Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012). Here, both considerations weigh heavily *against* preemption. On the one hand, there is no "clear conflict" between this lawsuit and any "express federal policy." *Garamendi*, 539 U.S. at 425. Indeed, Defendants do not even identify the specific foreign affairs policy, treaty, or executive action that, in their view, is undermined by

---

[9] Defendants also assert that the State's claims are completely preempted because they necessarily arise under federal common law. *See* NOR ¶ 189. That position, however, contradicts Defendants' earlier statement that federal common law provides a "ground for removal [that] is separate and independent from the complete preemption ground for removal." *Id.* ¶ 14 n.24. Regardless, the State's claims do not arise under federal common law, as explained above. *See* Part IV.B., *supra*.

the State's lawsuit. On the other hand, this litigation plainly qualifies as an exercise of the State's traditional police powers because it seeks to protect itself and its citizens from deceptive business practices and local environmental hazards. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 150 (1963) (the "traditional power" of states extends to "the protection of consumers"); *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 85 (3d Cir. 2017) (same); *Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 442 (1960) (environmental regulation "enacted for the manifest purpose of promoting the health and welfare of the city's inhabitants" is an exercise of traditional "police power"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 959 F.3d 1201, 1215 (9th Cir. 2020) (same); *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 137 (Conn. 2019) ("The regulation of advertising that threatens the public health, safety, and morals has long been considered a core exercise of the states' police powers."). Accordingly, the Court should reject Defendants' meritless attempts to remove on the basis of complete preemption.

### E. There is no federal officer removal jurisdiction because no federal officer directed the Defendants' tortious conduct.

The federal officer removal statute, 28 U.S.C. § 1442, permits removal only if four requirements are met: "(1) the defendant is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' the United States, its agencies, or its officers; (3) the plaintiff's claims against the defendant are 'for, or relating to' an act under color of federal office; and (4) the defendant raises a colorable federal defense to the plaintiff's claims." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (brackets omitted).

Here, Defendants' claims to federal officer jurisdiction fail for three primary reasons. First, the State expressly disclaims any injuries arising from the supply of fossil fuels to the federal

government. Second, Defendants fail to show even a tenuous connection between (1) any of the activities that they purportedly performed under the direction of a federal officer (*e.g.*, selling the government oil and gas during the two World Wars) and (2) the misconduct alleged in the Complaint (*i.e.*, a sophisticated campaign to deceive consumers and the public about the risks of fossil fuels). Third, Defendants do not establish that they were acting under the control of federal officers when they carried out any of their alleged activities.[10] Accordingly, this Court should join *Boulder II*, *Baltimore II*, *Rhode Island II*, and *San Mateo II* in rejecting Defendants' baseless assertions of federal officer jurisdiction.[11]

> **1. The Complaint disclaims injuries arising from Defendants' provision of fossil fuels to the federal government, and Defendants therefore seek to assert a defense against a claim that does not exist.**

The Complaint disclaims "injuries . . . that arose from Defendants' provision of fossil fuel products to the federal government, and seeks no recovery or relief attributable to such injuries." Compl. ¶ 14. In the federal officer context, where a party disclaims injuries arising from federal activities, "remand clearly is appropriate, because [the defendant] cannot prove a causal nexus between its government contracts and [plaintiff's] claims." *Fisher v. Asbestos Corp.*, No. 2:14-CV-

---

[10] The Court also lacks jurisdiction because Defendants do not have a colorable federal defense. Defendants' vague listing of defenses, without any explanation as to why those defenses apply, NOR ¶ 139, does not satisfy their burden. *See In re Asbestos Litig.*, 661 F. Supp. 2d 451, 454 (D. Del. 2009) ("[A] moving defendant [is required] to demonstrate that there is a colorable federal defense to a plaintiff's claims.").

[11] *See Boulder II*, 965 F.3d at 820–27 (finding ExxonMobil did not act under a federal officer when it participated in the OCS lease program); *Baltimore II*, 952 F.3d at 463–471 (finding that Citgo's fuel supply agreements and Chevron's OCS leases did not satisfy the "acting under requirement," and that Chevron's OCS leases and Standard Oil's operations at the Elk Hills reserve were not sufficiently related to Baltimore's claims to support removal); *Rhode Island II*, 979 F.3d at 59–60 (rejecting arguments concerning Elk Hills reserve, OCS leases, and fuel supply agreements because there was "simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer"); *San Mateo II*, 960 F.3d at 600–03 (finding fuel supply agreements with NEXCOM, Standard Oil's unit agreement at Elk Hills, and defendants' OCS leases did not satisfy the "acting under" prong).

02338-WGY, 2014 WL 3752020, at *3 (C.D. Cal. July 30, 2014) (collecting cases). Indeed, to "deny remand [in such a] case would affirm [defendant's] right to assert a defense against a claim that does not exist, an absurd result." *Id.*

Defendants attempt to argue that the State's waiver is ineffective, NOR ¶ 140, but their cited cases are inapposite because they address narrower waivers or waivers contradicted by a plaintiff's allegations—neither of which apply here. *See Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) (finding disclaimer was ineffective because it was qualified to "keep[] in play a claim against Defendants who could legitimately assert the federal officer defense"); *Ballenger v. Agco Corp.*, No. C 06–2271 CW, 2007 WL 1813821 at *2 & n.2 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective when it waived federal claims but did not waive "any claims arising out of work done on U.S. Navy vessels"); *compare Keeney v. A.W. Chesterton Co.*, No. CV 11-6192 PA (AGRX), 2011 WL 13220926, at *3 (C.D. Cal. Aug. 9, 2011) (upholding waiver and distinguishing *Ballenger*). Also without merit is Defendants' assertion that the disclaimer is ineffective because greenhouse gases purportedly cannot be traced to one particular source in one particular jurisdiction. NOR ¶ 140. Defendants have offered no evidence that the harms attributable to federal activities cannot be isolated, or that the State's claims will necessarily require proof of harm caused by conduct under federal direction. *See Fisher*, 2014 WL 3752020, at *1 (rejecting argument that waiver was ineffective "because it is obvious that the only claims [the plaintiff] could have against [the defendant] relate to its government work," where asbestos complaint "comprise[d] allegations covering a wide range of exposure incidents and broadly directed at many defendants"). Moreover, as alleged in the Complaint, "[b]y quantifying greenhouse gas pollution attributable to [Defendants'] products and conduct, climatic and environmental responses to those emissions are

27

also calculable, and can be attributed to [Defendants] on an individual and aggregate basis." Compl.

¶ 59.

### 2. Defendants' campaign of deception and other wrongful conduct were not "for, or relating to" any act under color of federal office, including the activities described in the Notice of Removal.

Defendants cannot show any connection between the disinformation and over-promotion campaign at the heart of this case and any of the individual fossil fuel production activities on which they rely, let alone show that their wrongful conduct was "for or relating to" an act under a federal officer. Instead, they distort the Complaint as seeking to end all fossil fuel production worldwide, and then posit that their leasing of federal mineral rights, plus certain contracts with the federal government, entitles them to federal jurisdiction. NOR ¶¶ 52–137. But this case does *not* seek to limit Defendants' production of fossil fuels, and as described above, the Complaint *disclaims* any injuries "ar[ising] from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes." Compl. ¶ 14. Thus, none of Defendants' tortious conduct is connected, causally or otherwise, with the duties of a federal superior. *See Papp*, 842 F.3d at 813 (observing that "the 'for or relating to' requirement" is satisfied where defendants "demonstrate a direct connection or association between the federal government and the [acts complained of] by [plaintiff]"). While the Court may credit the factual allegations in a removal petition, it need not (and should not) blindly adopt Defendants' baseless legal conclusions concerning the relationship between the alleged misconduct and the actions of federal officers, especially where, as here, those actions are "not plausibly related to" the conduct in the Complaint. *See Massachusetts*, 462 F. Supp. 3d at 47 (rejecting Exxon's "overreading" of the complaint because "[a] fair reading of the complaint tells a far different story").

Multiple courts have rejected Defendants' warping of analogous complaints. In *Baltimore II*, the Fourth Circuit explained the errors in Defendants' position:

> When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign. Of course, there are many references to fossil fuel production in the Complaint, which spans 132 pages. But, by and large, these references . . . [are] not the source of tort liability. Put differently, Baltimore does not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil fuel products; it is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change.

952 F.3d at 467. Faced with similar arguments, the First Circuit reached the same result in *Rhode Island II*:

> At first glance, these agreements may have the flavor of federal officer involvement in the oil companies' business, but that mirage only lasts until one remembers what Rhode Island is alleging in its lawsuit. Rhode Island is alleging the oil companies produced and sold oil and gas products in Rhode Island that were damaging the environment and engaged in a misinformation campaign about the harmful effects of their products on the earth's climate.

979 F.3d at 59–60; *see also Massachusetts*, 462 F. Supp. 3d at 47 (ExxonMobil's deceptive marketing and sales tactics "were not plausibly 'relat[ed]' to the drilling and production activities supposedly done under the direction of the federal government.").

The result is the same here. To begin, many of the acts that Defendants purportedly took under color of federal office *predate* the misconduct that forms the core basis of the State's claims, namely: a campaign, accelerating in the 1980s and continuing to this day, to conceal and misrepresent the dangers of fossil fuel products while simultaneously promoting their unrestrained sale and use. *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 946 (E.D.N.Y. 1992) ("Critical under the [federal officer removal] statute is 'to what extent defendants acted under federal direction' at the time they were engaged in the conduct now being sued upon."); *cf. Coleman v. Trans Bay Cable, LLC*, No. 19-CV-02825-YGR, 2019 WL 3817822, at *4 (N.D. Cal. Aug. 14, 2019) (in federal enclave context, "jurisdictional inquiry . . . must focus on this same period of time"). For example, Defendants spend much of their removal petition describing: (1) the United States' efforts to obtain

oil and gas during the Korean War, the two World Wars, and even earlier events, NOR ¶¶ 52–61; (2) Standard Oil's operation of the petroleum reserve at Elk Hills, beginning in 1944, *id.* ¶¶ 90–107; (3) the sale of "specialized petroleum products" to the U.S. military during World War II, *id.* ¶¶ 55, 115–19; and (4) pipeline construction during World War II, *id.* ¶¶ 120–24. But the Court should disregard this distant historical conduct both because it is irrelevant given the State's disclaimer, and because it cannot serve as the basis for concluding that Defendants engaged in their campaign of deception under color of federal office *decades later*.

In any event, even if all of the acts that Defendants purportedly took at the direction of a federal officer occurred within the relevant period, *none* of them have anything to do with "the acts complained of by [the State]." *Papp*, 842 F.3d at 813. Instead, Defendants rest their claim to federal officer jurisdiction on any conduct that relates to the production or sale of fossil fuel products pursuant to federal government contracts or programs. NOR ¶¶ 59–66 (federal consumption of fossil fuels and federal policies to incentivize domestic production of fossil fuels); *id.* ¶¶ 68–89 (Defendants' production of oil and gas on federal lands pursuant to OCSLA and MLA leases); *id.* ¶¶ 90–107 (Chevron's production of oil on the Elk Hills Reserve); *id.* ¶¶ 108–13 (Defendants' supply of oil to Strategic Petroleum Reserve ("SPR") and management of SPR infrastructure); *id.* ¶¶ 114–37 (Defendants' sale of jet fuel and other fossil fuel products to the military).

But the production of fossil fuels is simply the delivery mechanism of the State's injury; the source of the tort (and the target of the remedy) is Defendants' decades-long campaign to deceive consumers and the public about the dangers of fossil fuels, which—in turn—inflated the market for Defendants' products and harmed the State and its citizens. For that reason, the Fourth Circuit rejected Defendants' OCS leases in *Baltimore II* as a basis for federal officer jurisdiction, concluding that even under the relaxed "related to" test, "[a]ny connection between fossil fuel

30

production on the OCS and the conduct alleged in the Complaint is simply too remote" to support removal. 952 F.3d at 466; *see also Boulder I*, 405 F. Supp. 3d at 976 (defendants failed to show "there is a causal connection between the work performed under the leases and Plaintiffs' claims"). And for the same reason, this Court should reject Defendants' attempts to manufacture federal officer jurisdiction based on a litany of examples of fossil fuel production or sales that Defendants claim were directed by federal government contracts or programs.

Put simply: Defendants fail to identify a single instance where the government exercised control over the misrepresentations that give rise to the State's suit. And that omission is fatal to Defendants' assertion of federal officer jurisdiction, as other courts routinely find in cases involving failure to warn or deceptive marketing. *See, e.g.*, *In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 131 (2d Cir. 2007) (federal officer removal improper where federal regulations "say nothing" about marketing and other tortious conduct); *Meyers v. Chesterton*, No. CIV.A 15-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the Defendants from complying with any state law duty to warn"), *vacated as moot sub nom. Meyers v. CBS Corp.*, No. 15-30528, 2015 WL 13504685 (5th Cir. Oct. 28, 2015); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 662 (E.D. Tex. 1999) (remanding case where defendant failed to "tether" production of avgas for military to plaintiff's failure to warn claims about asbestos); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 428 F. Supp. 2d 1014, 1017–18 (D. Minn. 2006) (remanding design defect case where FDA did not exercise control over design, manufacture, or sale of the defibrillators at issue).

Additionally, contrary to Defendants' arguments, NOR ¶ 49, neither *Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020), nor *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 471 (3d Cir. 2015), *as amended*

(June 16, 2015) ("*Defender Ass'n*"), demonstrate that jurisdiction is appropriate here. In *Baker*, the Seventh Circuit found that the government had "required" one defendant's predecessor to refine lead and other metals "according to detailed federal specifications" at a site, such that later-discovered lead pollution at the site was "connected to or associated with" the government's explicit, coercive control over the predecessor's activities, and therefore the plaintiffs' claims arising out of that pollution. 962 F.3d at 940, 945. In *Defender Association*, Pennsylvania alleged that attorneys from the Federal Community Defender organization were misusing federal grant funds to appear in state proceedings, and sought to disqualify them from such proceedings. 790 F.3d at 461. The Third Circuit found that "the acts complained of undoubtedly 'relate to' acts taken under color of federal office" because the attorneys' employment with the Federal Community Defender formed "the very basis" of the suit, which concerned whether the organization was "violating the federal authority granted to it." *Id*. at 472. Any relationship here between general government direction and Defendants' overall production of fossil fuels is far more tenuous than the relationships in *Baker* or in *Defender*; and as discussed above, there is no connection at all between government direction and Defendants' decades of deception, misrepresentations, and overpromotion.

In short, Defendants have not demonstrated that the State's "Complaint rests on acts done 'for or relating to' a federal officer or agency." *Papp*, 842 F.3d at 813. And Defendants cannot meet this requirement by recasting the Complaint into something that it is not. Accordingly, the Court can—and should—dismiss Defendants' claim to federal officer jurisdiction, without reaching any of the other requirements of Section 1442.

### 3. Defendants cannot show they were acting under a federal officer.

Even if the Court were to consider the second prong for federal officer jurisdiction, Defendants have also failed to establish that they were "acting under" a federal officer. To meet this burden, Defendants must show both that they were "involve[d in] an effort to *assist*, or to help *carry out*, the duties or tasks of [a] federal superior" and that their relationship with the federal superior "involve[d] 'subjection, guidance, or control.'" *Watson*, 551 U.S. at 151–52; *see also Defender Ass'n*, 790 F.3d at 469 ("adopt[ing] the principles outlined in *Watson*"). In addition, the Third Circuit has signaled that, as part of "the 'acting under' inquiry," a court should confirm that "the [plaintiff's] allegations are directed at the relationship between the defendant and the federal officer or agency." *Papp*, 842 F.3d at 813 (brackets omitted). Defendants cannot satisfy the "acting under" prong because, as discussed above, Defendants fail to show that there is any connection whatsoever between the misconduct giving rise to the State's claims and the acts Defendants purportedly performed at the direction of federal officers, particularly given the fact that the State has disclaimed injuries arising from Defendants' provision of fossil fuels to the federal government. *See* Part IV.E.1, *supra*.

**World War II and the Korean War**:  Again, Defendants' arguments concerning their sale of fuel *to the military and federal government* during the early twentieth century, including during World War II and the Korean War (the "Wars"), fail because of the State's disclaimer. Such arguments also have no bearing on whether Defendants were acting under a federal officer decades later, when they engaged in the campaign of deception that is the basis for the State's suit. In any event, however, Defendants' bare assertion that their products were vital to American war efforts, NOR ¶¶ 53–55, does not establish that Defendants were acting under a federal officer when they sold fuel to the U.S. military. The only "evidence" Defendants offer concerning federal control

during this period is a citation to *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048, at *2 (S.D. Tex. Sept. 16, 2020). That case involved the government's role in hazardous waste releases at refineries, for the purpose of allocating liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), but did not address whether the government's control over refining activities warranted removal under 28 U.S.C. § 1442.

Even assuming *arguendo* that Defendants' activities during the Wars have some relation to the decades later deceptive conduct alleged in the Complaint—which they do not—Defendants' evidence fails to show that they were "under the 'subjection, guidance, or control'" of a federal officer. *San Mateo II*, 960 F.3d at 599 (citation omitted).[12] Rather, their evidence demonstrates that the relationship between the military and the oil industry during the Wars was cooperative and mutually beneficial. As one historical report cited by Defendants states: "The oil industry produced the oil that produced results. *No Government agency had to compel them to do the job*." Ex. 31, D.I.

---

[12] Defendants' references to fact findings in other cases—which are, again, limited to the Wars and therefore have no causal connection to the deception campaign alleged here—do not support their arguments either. *See* NOR ¶¶ 56–57, 115. Like *Exxon Mobil Corp.*, 2020 WL 5573048, *Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014), involved the government's role in hazardous waste releases at refineries during the Wars for the purpose of allocating liability under CERCLA, 42 U.S.C. § 9601 *et seq*. Neither case considered whether federal officer removal was warranted, including whether the government's control over refining activities would have engendered undue "local prejudice" in state court. *See San Mateo II*, 960 F.3d at 599. And *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002), also a CERCLA case, actually underscores the cooperative relationship between industry and the military during WWII, noting that "[a]lthough the [War Production Board], [Petroleum Administration for War], and other government agencies had the authority to require production of goods at refineries owned by the Oil Companies . . . in fact they relied almost exclusively on contractual agreements to ensure avgas production." *Id.* at 1049–50. Moreover, "[t]hroughout the war, the Oil Companies designed and built their facilities, maintained private ownership," "managed their own refinery operations," and "affirmatively sought contracts to sell avgas to the government," which "were profitable throughout the war." *Id.* at 1050. Such conduct does not evidence the subjection, guidance, or control required to warrant federal officer jurisdiction.

34

1-3 at 5 (John W. Frey, et al., *A History of the Petroleum Administration for War: 1941–1945* (1946)) (emphasis added). The same report describes "the mechanics of planning, financing, and operating" infrastructure as "wartime teamwork of the Government and industry," with the Petroleum Administration for War ("PAW") and the industry cooperatively agreeing on which oil pipelines would be built and which would be funded by the government. *See id.* at 3.

Defendants offer no compelling evidence of actual coercion by the PAW over their wartime production. *See* NOR ¶ 115–16. For example, Defendants' Exhibit 74 states that the success of the "intricate military supply procedure depended in large measure upon *close cooperation* between PAW and the industry as well as with the military forces" and that PAW's role was to "designate *for* the military," and not *to* the oil industry, which companies could supply the required products, in what quantities, and when. Ex. 74, D.I. 1-6 at 34 (Statement of George A. Wilson *in Wartime Petroleum Policy Under the Petroleum Administration for War: Hearings Before a Special Committee Investigating Petroleum Resources*, U.S. Senate, S. Res. 36 (Nov. 28–30, 1945)) (emphasis added). At most, PAW designated that a fraction of a particular refinery's output be committed to "military products." *Id.* But Defendants do not identify such products as fossil fuels, let alone detail which Defendant(s) produced them or in what quantity, so as to carry their burden to establish federal officer jurisdiction.[13]

Defendants also offer a speech hypothesizing a need for unspecified alternatives to voluntary public rationing as a means of bolstering avgas supplies, Ex. 59, D.I. 1-4 at 46–56 (Speech by Secretary Harold Ickes to the Conference of Petroleum Industry Chairmen (Aug. 11, 1941)); and

---

[13] Again, however, even if Defendants could meet their evidentiary burden, the Complaint disclaims injuries arising "from Defendants' provision of fossil fuel products to the federal government," Compl. ¶ 14, and thus Defendants are seeking "to assert a defense against a claim that does not exist." *Fisher*, 2014 WL 3752020, at *3.

a letter discussing measures to ensure oil company responses to an earlier telegram, Ex. 55, D.I. 1-4, 31–33 (Letter from P.M. Robinson to R.K. Davies, *Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams* (Aug. 12, 1942)). Neither document demonstrates an actual instance of federal subjection to produce oil (let alone to deceptively market it), nor carries the weight of coercion necessary to establish the "acting under" element. *See, e.g.*, *Kelly v. Monsanto Co.*, No. 4:15 CV 1825 JMB, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016) (granting remand where the defendants failed to show that a defendant "was compelled to produce the PCBs under threat of criminal sanction"). The record here is also devoid of actual directives requiring any alleged "changes to Defendants' refining equipment and operations" during the Wars. NOR ¶ 117 (citing Ex. 56, D.I. 1-4 at 35–37 (W.J. Sweeney et al., *Aircraft Fuels and Propellants: A Report of the [Army Air Force] Scientific Advisory Group* (1946)), for the unremarkable observation that a "refiner cannot build the equipment for making [a] fuel without knowing what its composition must be").

Finally, Defendants claim that through PAW, "[f]ederal officers exerted operational control" over two large pipelines commonly known as the "Big Inch" and "Little Inch." NOR ¶¶ 121–24. But again, the construction of the "Inch" pipelines during WWII has no causal connection with the deceptive conduct alleged in the Complaint. And in any event, War Emergency Pipelines, Inc. ("WEP") built the "Inch" pipelines, not Defendants. *Schmitt v. War Emergency Pipelines*, 175 F.2d 335, 335 (8th Cir. 1949); NOR ¶ 121. While a handful of Defendants held minority shares in WEP, WEP is the proper entity to evaluate "acting under" with respect to pipeline construction, and it dissolved in 1947. *See* Ex. 33, D.I. 1-3 at 14–17 (Certificate of Dissolution of War Emergency Pipelines, Inc. (Aug. 28, 1947)).

***Federal Promotion of Domestic Fossil Fuel Production***: Defendants' excursion into the history of federal energy policies and fuel shortages, NOR ¶¶ 59–66, does not show that when they committed the tortious acts alleged here they were acting under the "subjection, guidance, or control" of a federal officer, or "assisting the federal officer in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *San Mateo II*, 960 F.3d at 599 (quoting *Watson*, 551 U.S. at 153–54). Rather, their citations illustrate a universal *demand* for fossil fuels during conflicts in the twentieth century, but describe conditions that are temporally and factually irrelevant to the tortious conduct alleged in the Complaint *and* devoid of federal involvement.[14] The relationships through which Defendants satisfied the United States' segment of that demand were merely arms-length commercial relationships insufficient to satisfy § 1442. For instance, the Government facilitated expanded OCS production during the Arab Oil Embargo, not by forcing Defendants to produce any particular quantity of oil from their leases, but instead by expanding the federal acreage available on the OCS to entice Defendants to apply for those potentially commercially lucrative leases. NOR ¶ 60.[15] Defendants demonstrate no federal compulsion to seek, let alone operate and produce from OCS leases—and proffer no federal interest in their deceptive marketing and disinformation campaign at all. At best, Defendants show there

---

[14] For instance, Defendants repeatedly cite two books regarding the demand for oil during World War I. Ex. 24, D.I. 1-2 at 52–66 (Daniel Yergin, *The Prize: The Epic Quest for Oil, Money & Power* (1991)); Ex. 70, D.I. 1-6 at 2–6 (Ian O. Lesser, *Resources and Strategy* (1989)). Both lack any discussion of Defendants' conduct at the direction of the federal government; instead, they more generally discuss activities during World War I, which are completely irrelevant here. The section reproduced in Exhibit 24, for example, almost exclusively discusses the *British* military's demand for oil during World War I, and the relationship between British Petroleum, Royal Dutch/Shell, and the British government, with only oblique references to the Wilson administration and American oil companies. *See* Ex. 24, D.I. 1-2 at 54–61.

[15] *See also* NOR ¶ 60 n.44 (citing *Excerpts from Nixon Message*, N.Y. TIMES (Apr. 19, 1973), https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html).

was demand for their products, and federal policies facilitated oil companies' opportunities to satisfy that demand. That is insufficient to confer federal officer removal jurisdiction, and would "expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Watson*, 551 U.S. at 153.

Defendants cite various sources regarding the "assist[ance]" they provided "in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy." NOR ¶ 66. But Defendants' argument regarding the "strategic importance of oil and gas," NOR at 1, does not mean that their production—much less their disinformation campaign— was "assisting the federal officer in fulfilling 'basic governmental tasks' that 'the government itself would have had to perform' if it had not contracted with a private firm." *San Mateo II*, 960 F.3d at 599. Defendants' arguments must be rejected.

**_Outer Continental Shelf_**: The Ninth Circuit in *San Mateo II* refused to find that defendants were acting under a federal officer based on substantially identical allegations as defendants make here regarding OCS leases. 960 F.3d at 602–03. *See* NOR ¶¶ 67–89. The Ninth Circuit explained that the OCS leases "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties. Nor are lessees engaged in an activity so closely related to the government's function that the lessee faces a significant risk of state-court prejudice." *Id.* (quotations omitted). The First, Fourth, and Tenth Circuits also found that the OCS leases Defendants rely on do not support federal officer removal, for the same reasons. *Rhode Island II*, 979 F.3d at 59 ("In the OCSLA leases . . . there appears to be no 'close supervision' of this extraction or production of oil 'specially conformed to government use.'" (citation omitted)); *Baltimore II*, 952 F.3d at 465–66 ("[W]e are not convinced that the supervision and control to which OCSLA lessees are subject connote the sort of 'unusually close' relationship that courts have

38

previously recognized as supporting federal officer removal."); *Boulder II*, 965 F.3d at 823 ("ExxonMobil's OCS leases do not contemplate the 'close supervision of the private entity by the Government' needed to bring a federal contractor relationship within these strict parameters." (citation omitted)).

Defendants' evidentiary proffer only demonstrates that they are wrong, and the First, Fourth, Ninth, and Tenth Circuits are right. First, Defendants argue that a never-enacted 1975 bill to amend OCSLA would have created "a national oil company," and therefore when Congress made totally different amendments to OCSLA in 1978 and opened the OCS to private lessees, it somehow considered the lessees to be performing "essential tasks" on behalf of the government. *See* NOR ¶ 69. None of that is correct. The 1975 bill Senator Hollings actually introduced would have created an *exploration* program within the Department of the Interior to "*measure* promptly the extent of the publicly owned oil and gas resources on the OCS." Ex. 9, D.I. 1-1 at 284 (*Statement of Sen. Hollings introducing Outer Continental Shelf Lands Act of 1975*, 94 Cong. Rec. S903 (daily ed. Jan. 27, 1975)). Under the bill, "[l]easing [OCS mineral rights] to private companies would await the availability of much-needed data on the size and location of oil and gas in new areas," so the government could "be sure that bids for production rights on federally explored tracts are truly representative of the value of the resources." *Id.* at 285. Senator Hollings analogized: "It would not be wise to auction off a much-loved and irreplaceable antique without first getting an objective appraisal of its value. . . . We cannot continue to auction [oil and gas resources] off at prices based on the buyers' own appraisals . . . ." *Id.* The 1975 bill's express purpose was not to nationalize OCS oil and gas production, but to ensure that the government could maximize its return on the sale of production rights to private lessees.

Unsurprisingly, the legislative history of the 1978 amendments that actually became law likewise illustrates Congress's intent to encourage private OCS oil and gas production. The reports of the Ad Hoc Select Committee on the Outer Continental Shelf, from which Defendants cherry-pick two pages, *see* Exs. 26 & 54, are clear: Under the bill subject to the report, "[p]rivate energy companies will continue to be the major explorers for oil and gas, and the developers and producers of those resources." *See* H.R. Rep. No. 94-1084 at 44 (1976).[16] The express purpose of the amendments were "to strike a proper balance between securing a fair return to the federal government for the lease of its lands, increasing competition in exploitation of resources, and providing the incentive of a fair profit to the oil companies, which must risk their investment capital." *Id.* at 48; *see also* Ex. 54 (page 48 of report). The 1977 report stated just as plainly that private companies would "face more and stricter regulations" under the amendments, but would "enjoy less red tape, fewer delays, and greater certainty about the political environment in which they are operating," while "certain elements of the energy industry will be assured a larger role in OCS activities." *See id.* The report states that "industry complaints about 'overregulation' should be reduced by [the bill] and its provisions providing for coordination and facilitating 'one-stop' shopping." *Id.* In other words, the report correctly describes the OCS leasing program as the sale of public rights and resources to heavily regulated private developers and not, as Defendants allege, the deputization of companies to perform an essential government function.

The rest of Defendants' evidence after 1978 suffers the same deficiency in that it portrays ordinary regulation of private business, not governmental subjection and control. Defendants note that lessees must prepare an environmental impact statement under the National Environmental

---

[16] *Available at* https://coast.noaa.gov/data/Documents/OceanLawSearch/House%20Report%20No .%2094-1084%20Part%201.pdf.

Policy Act, NOR ¶ 73; must submit "detailed plans" to the Bureau of Ocean Management, Bureau of Safety and Environmental Enforcement, and other agencies, *id.* ¶¶ 76–77; must pay substantial royalties either in cash or in kind, *id.* ¶¶ 81–83; and must comply with a wide range of regulations either created expressly by statute or codified in the Code of Federal Regulations, *see id.* ¶¶ 74, 75, 84–86.[17] But those are all either "lease requirements [that] largely track legal requirements," *San Mateo II*, 960 F.3d at 603, or the statutory and regulatory directives themselves. The law is clear: "Mere compliance with the law, even if the laws are highly detailed, and thus leave an entity highly regulated, does not show that the entity is 'acting under' a federal officer." *id.* (cleaned up); *Watson*, 551 U.S. at 153 ("[A] highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone."). Defendants have shown that they are highly regulated—nothing more.

As the First, Fourth, Ninth, and Tenth Circuits have all correctly held, "the leases on which the defendants rely do not give rise to the 'unusually close' relationship where the lessee was 'acting under' a federal officer." *San Mateo II*, 960 F.3d at 603; *accord Rhode Island II*, 979 F.3d at 59; *Baltimore II*, 952 F.3d at 465–66; *Boulder II*, 965 F.3d at 823.

**<u>Elk Hills Reserve</u>**: Next, Defendants argue that Standard Oil (Chevron's predecessor) acted under a federal officer when it entered into agreements with the Navy that governed the joint control and operation of fossil fuel deposits at the Elk Hills Reserve. *See* NOR ¶¶ 90–107. This contractual

---

[17] Most of the statutory or lease requirements are standard procedures that accompany any oil and gas production, which is a technically, logistically, and scientifically complex process. Defendants observe, for example, that the Department of the Interior may by statute set a Maximum Efficient Rate of extraction ("MER") from an OCS reservoir. *See* NOR ¶ 80. But a particular hydrocarbon reservoir's MER is not arbitrary: the reservoir's geological and fluid properties determine the maximum rate at which petroleum can be extracted without some volume of the pool becoming stranded and unrecoverable. *See* 30 C.F.R. § 250.105 (defining MER under OCSLA to mean "the maximum sustainable daily oil or gas withdrawal rate from a reservoir that will permit economic development and depletion of that reservoir without detriment to ultimate recovery"). The government's requirement that its lessees not exceed the MERs on leased tracts is standard petroleum engineering.

arrangement, however, amounts to nothing more than an "arm's-length business arrangement," *San Mateo II*, 960 F.3d at 602, and it therefore falls short of the "unusually close" relationship that the acting-under requirement typically demands, *Defender Ass'n*, 790 F.3d at 468.

In attempting to provide evidence of the requisite supervision and control, Defendants point first to a Unit Plan Contract ("UPC") executed by Standard and the Navy in the 1940s. *See* NOR ¶¶ 93–99. But as the Ninth Circuit correctly concluded when confronted with the exact same contract, the terms of the UPC do not create an acting-under relationship. *See San Mateo II*, 960 F.3d at 602. Rather, they embody an "arm's-length business arrangement" that allowed Standard and the Navy to "coordinate their use of the oil in a way that would benefit both parties." *Id.* On the one hand, the Navy gained exclusive control over the exploration, prospecting, development, and operation of the Elk Hills Reserve (including the portions owned by Standard), *see* Ex. 6, D.I. 1-1 at 262, § 3(a) (UPC), thereby allowing the federal government to curtail oil production to ensure the availability of oil reserves in the event of a national emergency, *see* NOR ¶ 91 & n.91.[18] Standard, for its part, received as compensation the right to produce a specified amount of oil from the reserve. *See* Ex. 6, D.I. 1-1 at 263, § 4(b) (UPC). As a result, when Standard extracted oil from the reserve pursuant to the terms of the UPC, it was "acting independently, not as the Navy's 'agent.'" *San Mateo II*, 960 F.3d at 602 (citations omitted). The UPC therefore cannot, itself, "give rise to a relationship where Standard was 'acting under' a federal officer for purposes of § 1442." *Id.*

Nor can Defendants satisfy the acting-under requirement based on a separate contractual agreement (the so-called "Operating Agreement") whereby the Navy apparently hired Standard as

---

[18] Citing U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 14 (July 1988), https://www.gao.gov/assets/220/210337.pdf.

an independent contractor to maintain and preserve the Elk Hills Reserve. *See* NOR ¶ 102; Ex. 27, D.I. 1-2 at 79–99 (Operating Agreement Between Navy and Standard Oil Relating to Elk Hills (Nov. 3, 1971)). Contrary to Defendants' assertion, this second business arrangement between Standard and federal government is *not* "an unusually close one involving detailed regulation, monitoring, or supervision." NOR ¶ 103 (quoting *Defender Ass'n*, 790 F.3d at 468). In fact, the Operating Agreement expressly directs *Standard*—not the Navy—to "furnish . . . a set of field operating procedures that are commensurate with [state law] . . . and good oil field practice." Ex. 27, D.I. 1-2 at 84, § 4(f). Nothing in the record, moreover, suggests that the Operating Agreement is anything more than "an arm's-length business arrangement with the Navy," just as the Ninth Circuit held the UPC to be. *San Mateo II*, 960 F.3d at 602. Indeed, Defendants effectively acknowledge as much when they note that the Navy selected the operator for the reserve by means of "competitive bidding."[19] NOR ¶ 100; *see also* GAO Report, *supra* n.18, at 15 ("Standard . . . bid for the operator's contract in 1944, [and] was awarded the contract.").

As for the changes at the Elk Hills Reserve in response to the oil crisis of the 1970s, *see* NOR ¶¶ 104–07, those only confirm that private production at the reserve was not done at the behest of a federal superior. The 1974 congressional authorization Defendants refer to concerning development of the reserve culminated in the Naval Petroleum Reserve Production Act of 1976 ("NPRPA"). In the Act, "Congress determined that the Navy no longer needed to maintain a petroleum reserve for a national emergency," and the parties "executed an amendment to the UPC,

---

[19] Defendants cite an unattributed statement that, at some point in the 1940s, Standard "*offered* to perform th[is] work without making a profit." But they do not provide any evidence showing that Standard ever actually performed such work without profit, and the only operator's contract that Defendants attach to their removal petition provides for a fee paid to Standard. Ex. 27, D.I. 1-2 at 85, § 5. In any event, whether a private party's voluntary cooperation with the government was profitable for the private party is irrelevant to whether it was acting under the government's subjection, guidance, and control.

Case 1:20-cv-01429-LPS   Document 89   Filed 01/05/21   Page 54 of 74 PageID #: 1683


removing any reference to the need for a petroleum reserve and substituting language emphasizing the new national policy to encourage *economic productivity*." *Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 754 (2013) (emphasis added). The NPRPA directed that reserve oil be sold "at public sale to the highest qualified bidder," on terms "so structured as to give full and equal opportunity for the acquisition of petroleum by all interested persons, including major and independent oil producers and refiners alike," without "creat[ing] or maintain[ing] a situation inconsistent with the antitrust laws." 10 U.S.C. §§ 7430(b)(1), (d), (g)(2).

Ultimately, the government's role at Elk Hills became that of a market participant offering its oil for sale at public auction. The field has "generated over $17 billion for the United States Treasury," NOR ¶ 106, precisely because the government sold oil on the open market; any role Chevron might have played as operator there was, once again, an "arm's-length business arrangement" to develop the reserve and bring the oil to market. *See San Mateo II*, 960 F.3d at 602.[20] It did not involve the kind of subjection, guidance, and control necessary to satisfy § 1442.

Even if Standard's operation of Elk Hills Reserve were subject to the type of federal supervision, guidance, and direction necessary to satisfy the acting-under requirement, it could not support federal officer jurisdiction because the Complaint's allegations are *not* "directed at" this conduct. *Papp*, 842 F.3d at 813. As noted above, the Complaint expressly disclaims any injuries "ar[ising] from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes." Compl. ¶ 14. Moreover, Defendants' own documents reveal that

---

[20] Standard "chose to withdraw from operating Elk Hills" in 1975, one year before Congress enacted NPRPA. NOR ¶¶ 104–05. Nevertheless, Defendants maintain that "Standard and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors." *Id.* ¶ 107. But the federal government did not direct or control the conduct of individual Committee members. Indeed, the UPC expressly envisions that individual members would freely disagree with one another. *See* Ex. 9, D.I. 1-1 at 269, § 9(a) (referring to the Secretary of the Navy "any matter" on which "the Operating Committee is unable to agree").

Standard's operation of the reserve was "marked by the congressional intent to *retain the oil in the ground* except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil." GAO Report, *supra* n.18, at 2 (emphasis added). Standard's work for the Navy mostly entailed maintaining the field and extracting as little oil as possible. *See id.* at 2, 15. Thus, even assuming Standard's activities at the Elk Hills Reserve were done under federal subjection and control, its reduced production of oil there has nothing to do with the alleged tortious conduct at the center of this lawsuit: a sophisticated deception campaign, directed at consumers and the public, to conceal and misrepresent the risks of Defendants' fossil fuel products. The State has not alleged any injury related to oil that Standard *did not* produce at Elk Hills.

   ***Strategic Petroleum Reserve***: This same reasoning precludes a finding that Defendants were acting under a federal officer when they produced oil and operated infrastructure for the SPR. NOR ¶¶ 108–13. The SPR constitutes the United States' supply of emergency crude oil and is principally filled through royalty-in-kind transfers from some Defendants and others, which accrue to the United States pursuant to oil and gas leases on the OCS. NOR ¶ 71. But these royalty payments are nothing more than the type of commercial transactions that the Ninth, Fourth, and Tenth Circuits have already found to be insufficient to support federal officer removal, as compliance with federal law is not enough. *San Mateo II*, 960 F.3d at 602–03; *Baltimore II*, 952 F.3d at 465–66; *Boulder II*, 965 F.3d at 823. "'[T]he willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more' cannot be 'characterized as the type of assistance that is required' to show that the private entity is 'acting under' a federal officer," and the fact that lessees pay royalties in kind which the United States then directs into the SPR does not change the result. *See San Mateo II*, 960 F.3d at 603 (quoting *Baltimore II*, 952 F.3d at 465).

The royalty-in-kind program was largely phased out in 2009, and the SPR is now supplied primarily through purchases on the open market. The regulations governing the purchase and sale of SPR oil make clear that the government views its role as that of a market participant, not one of subjection, guidance, or control over entities like Defendants. "To reduce the potential for negative impacts from *market participation*," the Department of Energy must review certain factors "prior to commencing acquisition of petroleum for the SPR," including: "[t]he outlook for international and domestic production levels;" "[e]xisting or potential disruptions in supply or refining capability;" and "[t]he level of market volatility." 10 C.F.R. § 626.4(a) (emphasis added). The Department of Energy must provide public notice before purchasing SPR oil, "usually in the form of a solicitation," and must "inform the public of its overall fill goals, so that they may be factored into market participants' plans and activities." *Id.* § 626.5(a)(1). Selling commodity oil to the government through a competitive bidding process, which the government then directs to the SPR, is simply not "an effort to *assist*, or to help *carry out*" the duties of a federal superior as required by § 1442. *See Watson*, 551 U.S. at 152.

Finally, lease provisions requiring certain lessees to participate "as a sales and distribution point in the event of an SPR drawdown," NOR ¶ 112 are also insufficient. The Secretary of Energy may "drawdown and sell petroleum products in the Reserve" if the President makes certain findings, 42 U.S.C. § 6241(a), (d)(1), and certain Defendants' leases apparently contain provisions describing their role in the event a drawdown is ordered. NOR ¶ 112. Those provisions are strikingly similar to OCSLA lease terms that the Ninth Circuit rejected as a basis for removal in *San Mateo II* because they merely "track[ed] legal requirements" imposed by statute. 960 F.3d at 603 (citing 43 U.S.C. § 1341(b)). The lease terms simply direct compliance with federal statutes, and "[m]ere compliance with the law, even if the laws are highly detailed, and thus leave an entity highly

regulated, does not show that the entity is acting under a federal officer." *Id.* (citations omitted). None of Defendants' involvements with the SPR constitute "acting under" a federal officer.

**_Compliance with Defense Production Act_**: Defendants' proffered "directives" under the Defense Production Act of 1950 ("DPA") similarly fall short of demonstrating federal control. First, Defendants cite to directives that were rescinded in 1953, decades before the misconduct at issue. *See* NOR ¶ 125; Ex. 34, D.I. 1-3 at 20 (*Fourth Annual Report of the Activities of the Joint Committee on Defense Production*, H.R. Rep. No. 84-1 (Jan. 5, 1955)). In any event, these directives did not demand any specific formulation or quantity of production for the military because they applied only to the use of certain fuel additives for non-avgas applications. *See id.* The suggestion that Defendants were directed to produce under the DPA for two months in 1973, Ex. 37, D.I. 1-3 at 36 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. TIMES (Nov. 28, 1973)), is insufficient to establish that they "act[ed] under" federal authority. *See New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1141 (D.N.M. 2020) (compliance with DPA insufficient to establish "acting under" element under *Watson*). Defendants' evidence does not indicate Defendants were being forced to produce anything they were not already producing, and at most were directed to prioritize government orders over others. Moreover, any such production was a minute fraction of Defendants' total production and is irrelevant to the State's claims, and disclaimed by the Complaint. *See*, *e.g.*, *Kelly*, 2016 WL 3543050 at *9 (rejecting federal officer jurisdiction where insignificant fraction of defendants' PCBs were sold to military).

**_Military Fuel Sales_**: Defendants' arguments regarding the sale of specialized fuel products to the military mainly focus on the Wars, NOR ¶¶ 114–25, which concluded decades or years before the misconduct alleged here. Even if Defendants' fuel sales to the military during the arguably relevant period, *see* NOR ¶¶ 126–37, could be considered (they cannot, as the State has disclaimed

injuries arising from such sales, *see* Compl. ¶ 14), these sales constitute arms-length commercial transactions for off-the-shelf products that cannot possibly give rise to federal officer jurisdiction. *See Baltimore II*, 952 F.3d at 465 ("arms-length commercial transactions" insufficient to satisfy "acting under" element of federal officer removal) (quoting *Boulder I*, 405 F. Supp. 3d at 977).

Defendants' commercial contracts with the military, Exs. 41–48, evidence exactly the type of arms-length commercial relationship held not to support federal officer jurisdiction in *San Mateo II*, 960 F.3d at 600. To the extent the military may have "controlled" Defendants' performance under those contracts, it did so only through its contractual rights, as any equivalent market participate would, by reserving the right to inspect goods and projects prior to delivery, *e.g.* Ex. 41, D.I. 1-3 at 81, Part III (Negotiated Contract No. AF33(657)-8577 with Shell Oil Company (Aug. 14, 1962)); or requiring that Defendants maintain secrecy around their performance, *e.g.*, Ex. 44, D.I. 1-3 at 98, Part V (Negotiated Contract No. AF33(657)-13272 with Shell Oil Company (June 30, 1964)). But none of those provisions establish that their fuel-related contract duties were "the duties or tasks of [a] federal superior" or that their relationship with any federal superior involved federal "subjection, guidance, or control" over conduct addressed by the State's claims. *Watson*, 551 U.S. at 152.

The more than 200 pages of federal solicitations and Tesoro contract excerpts proffered by Defendants do not give rise to federal officer jurisdiction. *See generally* Ex. 60, D.I. 1-5 at 2–221 (*Tesoro Corporation: Exemplary Contracts for Highly Specialized Military Jet Fuel*). Instead, they confirm that the government did *not* solicit fossil fuel companies to engage in deception campaigns concerning military jet fuel, let alone compel such conduct. *Id*. Nor did the government force Tesoro to enter contracts or control Tesoro's sales, advertising, processing, or refining activities. *Id*.

The same is true of the Military Specification sheets described in the Notice of Removal.

*See*, e.g., NOR ¶¶ 131–35. It is not sufficient that these documents lay out "detailed specifications." As Defendants concede, they must also evidence the "'compulsion to provide the product to the government's specifications'" to establish the "acting under" element. *Id.* ¶ 137 (quoting *Baker*, 962 F.3d at 943). Defendants demonstrate no compulsion to produce specialized jet fuel, let alone a compulsion to misrepresent the consequences of using that fuel. This evidence cannot satisfy the "acting under" test. Moreover, Defendants present no evidence that the Military Specifications for jet fuel prevented Defendants from complying with any of the state-law duties at issue in this lawsuit, including their duty to warn.

In sum, the Court lacks federal officer jurisdiction for at least three independent reasons. First, the Complaint disclaims injuries arising "from Defendants' provision of fossil fuel products to the federal government," Compl. ¶ 14, and the sales to the government Defendants describe in the Notice of Removal are therefore irrelevant to the claims at issue here. Second, the misconduct alleged in the Complaint—Defendants' campaign of deception and failure to warn—was not "for, or relating to" any act taken under a federal officer. Defendants' arguments on this point mischaracterize the Complaint as seeking to end all fossil fuel production, as opposed to seeking, as it does, redress for Defendants' tortious conduct and violations of Delaware's Consumer Fraud Act. Third, though the Court need not reach the issue, Defendants have not identified any instance in which they "acted under" a federal officer or where they were otherwise subject to a federal officer's subjection, guidance, or control.

### F. There is no OCSLA jurisdiction because the State's claims do not arise out of and are not connected with the Outer Continental Shelf.

"OCSLA defines a body of law uniquely applicable to the seabed, the subsoil, and fixed structures such as artificial island drilling rigs, all of which pertain to the outer continental shelf lands." *Superior Oil Co. v. Andrus*, 656 F.2d 33, 35 (3d Cir. 1981). It provides subject matter

jurisdiction over disputes involving physical injuries that occur on the OCS, or disputes actually and directly involving OCS drilling and exploration activities, such as contract disputes between OCS contractors. Contrary to Defendants' assertions, *where* Defendants extracted or produced fossil fuels is immaterial to this case, and does not create a basis for OCSLA jurisdiction. Every court to consider Defendants' argument in an analogous case has therefore rejected it;[21] this Court should do the same.

OCSLA grants federal courts jurisdiction over cases "arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of the minerals" held in certain regions of the OCS. 43 U.S.C. § 1349(b)(1). Although the Third Circuit has not ruled on the outer limits of OCSLA jurisdiction, Defendants' arguments fail even under a maximally broad reading of persuasive Fifth Circuit law, which sets forth a two-step test to determine

> whether (1) the activities that caused the injury constituted an "operation" "conducted on the [OCS]" that involved the exploration and production of minerals, and (2) the case "arises out of, or in connection with" the operation.

*In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).

First, "the term 'operation' contemplate[s] the doing of some physical act on the OCS." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994). But the relevant activity

---

[21] *See, e.g.*, *Boulder I*, 405 F. Supp. 3d at 978 ("[F]or jurisdiction to lie, a case must arise directly out of OCS operations. . . . The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection."); *Rhode Island I*, 393 F. Supp. 3d at 151–52 (no OCSLA jurisdiction even where "Defendants' operations on the [OCS] may have contributed to the State's injuries," because "Defendants have not shown that these injuries would not have occurred but for those operations"); *Baltimore I*, 388 F. Supp. 3d at 566 ("Even under a 'broad' reading of the OCSLA jurisdictional grant endorsed by the Fifth Circuit, defendants fail to demonstrate that OCSLA jurisdiction exists."); *San Mateo I*, 294 F. Supp. 3d at 938–39 ("Removal under the [OCLSA] was not warranted because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf.").

here "is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change."[22] *Baltimore II*, 952 F.3d at 467; *see also Rhode Island II*, 979 F.3d at 60; *see, e.g.*, Compl. ¶¶ 1, 7, 12, 226. Defendants' deception is not an "operation" conducted on the OCS. *See Boulder I*, 405 F. Supp. 3d at 978–79; *Baltimore I*, 388 F. Supp. 3d at 566–67. "[F]or jurisdiction to lie, a case must arise directly out of OCS operations," and "[t]he fact that some of [Defendants'] oil was apparently sourced from the OCS does not create the required direct connection" between the State's claims and an operation on the OCS. *Boulder I*, 405 F. Supp. 3d at 978. Courts routinely refuse to exercise jurisdiction over cases like this one, where the claims are only tangentially related to mineral exploration and production on the OCS, and where granting relief would have no effect on those operations.[23]

Second, a case "arises out of, or in connection with" an OCS operation when (1) the plaintiff "would not have been injured 'but for'" the operation, *Recar v. CNG Producing Co.*, 853 F.2d 367,

---

[22] Defendants incorrectly assert that "[t]he Court must '"credit [Defendants'] theory of the case for purposes . . . of" the removal inquiry.'" NOR at 9 (quoting *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020); *Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999)). *K&D LLC* held that the Court may credit Defendants' theory of the case with respect to *federal officer removal* only. 951 F.3d at 506. Likewise, in *Jefferson County*, the Supreme Court only credited the defendants' theory of the case as to whether the suits were "'for a[n] act under color of office' for the purposes of federal officer removal. 527 U.S. at 432.

[23] *See, e.g.*, *LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*, No. CIVA 06-11248, 2007 WL 854307, at *5 (E.D. La. Mar. 16, 2007) (no OCSLA jurisdiction over insurance dispute "regarding damages to production facilities that have already occurred" because suit "does not affect or alter the progress of production activities on the OCS, nor does it threaten to impair the total recovery of federally owned minerals from the OCS"); *Parish of Plaquemines v. Total Petrochem. & Refining USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014) (no OCSLA jurisdiction where injurious conduct occurred in state waters, even though it "involved pipelines that ultimately stretch to the OCS"); *Brooklyn Union Expl. Co. v. Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) ("A controversy exclusively over the price of gas which has already been produced, as in the instant case, simply does not implicate the interest expressed by Congress in the efficient exploitation of natural resources on the OCS.").

369 (5th Cir. 1988), and (2) granting relief "threatens to impair the total recovery of the federally-owned minerals" from the OCS, *EP Operating Ltd. P'ship*, 26 F.3d at 570. Neither is satisfied here.[24] "[T]he 'but-for' test . . . is not limitless" and must be applied in light of the OCSLA's overall goals. *Plains Gas Sols., LLC v. Tenn. Gas Pipeline Co*., 46 F. Supp. 3d 701, 704–05 (S.D. Tex. 2014). "[A] 'mere connection' between the cause of action and the OCS operation" that is "too remote" will not "establish federal jurisdiction." *Deepwater Horizon*, 745 F.3d at 163. Here, the State's claims are based on Defendants' failure to warn consumers and the public of known dangers associated with fossil fuel products, and Defendants' campaign to deceive the public regarding those dangers—no matter where or by what operations some products' constituent elements were originally extracted. *See, e.g.*, Compl. ¶ 12. Defendants' assertion that OCSLA jurisdiction attaches because "a substantial quantum" of oil and natural gas production arise from OCS operations, NOR ¶ 40, amounts to an "argument that there is federal jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the injury," which would "dramatically expand the statute's scope." *See Boulder I*, 405 F. Supp. 3d at 979. Defendants have not met their burden to show that the State would not have suffered its injuries but for Defendants' operations on the OCS—even assuming some quantum of fossil fuels originating from the OCS contributed to them.[25]

---

[24] Defendants' assertion that "Plaintiff also alleges that emissions have risen due to increased OCS extraction technologies," NOR ¶ 40 (citing Compl. ¶¶ 143–46), mischaracterizes the Complaint. Those paragraphs refer to actions by Defendants at odds with their climate denialist communications to the public, such as "raising offshore oil platforms to protect against sea level rise." Compl. ¶ 142.

[25] Defendants have argued in every similar case that the sheer volume of their production on the OCS means their OCS operations must be a but-for cause of the plaintiff's injuries, therefore satisfying OCSLA jurisdiction. Every court has rejected that argument. *See San Mateo I*, 294 F. Supp. 3d at 938–39; *Boulder I*, 405 F. Supp. 3d at 979; *Rhode Island I*, 393 F. Supp. 3d at 151–52; *Baltimore I*, 388 F. Supp. 3d at 566–67. Moreover, Defendants' citation to a Congressional Research Service Report to support their argument that production of fossil fuels from the OCS is and has been substantial falls flat. *See* NOR ¶ 40. The Report examines fossil fuel production from

Nor will granting relief here threaten to impair recovery from the OCS, NOR ¶ 42. The Complaint's single reference to abatement states that the State "seeks an order that provides for abatement of the public nuisance Fossil Fuel Defendants have created, [and] enjoins Fossil Fuel Defendants from creating future common-law nuisances." Compl. ¶ 263. Far from enjoining Defendants' global production of fossil fuels, the State seeks to abate the nuisance Defendants have created in the State and prevent future injury in the State. *See, e.g., People v. Conagra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 169 (Cal. Ct. App. 2017), *cert. denied* 139 S. Ct. 377 (2018) (upholding abatement fund remedy in action by public entities to abate lead paint public nuisance by removing paint from public buildings); *see also Oklahoma v. Purdue Pharma LP*, No. CJ-2017-816, 2019 WL 4019929, at *12, *15 (Okla. Dist. Ct. Aug. 26, 2019) (finding defendants created a public nuisance with their misleading marketing and promotion of opioids and ordering defendants to fund abatement). Such relief would not "threate[n] to impair the total recovery of the federally-owned minerals" from the OCS. *EP Operating Ltd. P'ship*, 26 F.3d at 570.

As to Defendants' argument that the Complaint "seek[s] damages that would inevitably affect exploration and production on the OCS," NOR ¶ 42, the fact that it may be expensive for Defendants to pay does not mean awarding damages interferes impermissibly with Defendants' business. *See Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1008 (9th Cir. 2013) ("It is certainly not impossible for an airline both to comply with federal regulations and to pay damages in state tort suits."). To the extent such arguments are even relevant here, the remedies the State seeks would

---

federal areas generally, rather than providing information on OCS production specifically, and in fact notes that crude oil production on federal lands *fell* from 36% (2009) to 24% (2017), and the decline of natural gas production on federal lands "can be attributed to offshore production falling by over 55%." *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 1, 4 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

not regulate "extraterritorially" on the OCS, *see e.g., Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001); *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 220 (2d Cir. 2004), nor pose an obstacle to the achievement of OCSLA's objectives, since the statute is not intended to maximize the profits of companies that violate state laws.

To find that OCSLA grants jurisdiction here would mean that any spill of gasoline sourced from some fraction of OCS oil, and any claims for nuisance abatement or monetary damages against companies that operate on the OCS, could be removed to federal court. Neither the OCSLA statute nor any case law permits such an absurd result. *See Boulder I*, 405 F. Supp. 3d at 979. Defendants' arguments must be rejected, as they have been in *Boulder I*, *Rhode Island I*, *Baltimore I*, and *San Mateo I*.

### G.     There is no enclave jurisdiction because the State's claim did not "arise" within any federal enclave.

"Federal courts have federal question jurisdiction over tort claims that *arise on* 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (emphasis added); *see also Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (similar). As Defendants concede, NOR ¶ 191, "[t]he key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling v. Doyle*, No. EP-13-CV-00323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014). This construction is consistent with the weight of case law on enclave removal, which holds that a cause of action "arises" when and where "the 'substance and consummation' of events giving rise to claims occur." *Coleman*, 2019 WL 3817822 at *3 (quoting *Totah v. Bies*, No. 10–CV–05956–CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011)); *Bordetsky v. Akima Logistics Servs.*, LLC, No. CV 14-1786 (NLH/JS), 2016 WL 614408, at *2 (D.N.J. Feb. 16, 2016) ("When dealing with a federal enclave, the focus is on where the tort occurred."); *Holliday v. Extex*, No.

54

CIV. 05-00194SPK/LEK, 2005 WL 2158488, at *4 (D. Haw. July 6, 2005), *report and recommendation adopted*, No. CIV05-00299SPK/LEK, 2005 WL 2179392 (D. Haw. Aug. 24, 2005) (holding key factor in determining whether enclave jurisdiction exists is "the location of the plaintiff's injury" and collecting cases indicating that the site of injurious exposure is key to establishing enclave jurisdiction).

Here, the Complaint expressly disclaims injuries to any federal property within Delaware. Compl. ¶¶ 3 n.2, 14, 231 n.239. Because the State's claims only "arise" for enclave purposes when and where the State suffered injuries, and the State disclaims injuries on federal land, federal enclave jurisdiction does not apply. Where a plaintiff makes such a disclaimer, courts routinely grant motions to remand for that very reason. *See*, *e.g.*, *Rhode Island I*, 393 F. Supp. 3d at 152 (enclave jurisdiction did not apply "since [the State's] complaint avoids seeking relief for damages to any federal lands."); *Boulder I*, 405 F. Supp. 3d at 974 (same where plaintiff did "not seek damages or abatement relief for injuries to or occurring to federal lands") (citations omitted); *Baltimore I*, 388 F. Supp. 3d at 565 (same where "[t]he Complaint . . . expressly define[d] the scope of injury to exclude any federal territory"). *Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) ("[B]ecause Washington avowedly does not seek relief for contamination of federal territories, none of its claims arise on federal enclaves"); *Goto v. Whelan*, No. 20-cv-01114 (HSG), 2020 WL 4590596, at *4 (N.D. Cal. Aug. 11, 2020) (granting remand based on disclaimer). As the *Boulder I* court held:

> It is not the defendant's conduct, but the injury, that matters. . . . Federal enclave jurisdiction thus does not exist here because Plaintiffs' claims and injuries are alleged to have arisen exclusively on non-federal land. That . . . Defendants may have caused similar injuries to federal property . . . does not provide a basis for removal.

405 F. Supp. 3d at 974 (citations omitted).

Moreover, even assuming *arguendo* that some tortious conduct relevant to the State's claims *did* occur on federal enclaves, federal jurisdiction still does not apply here for two reasons: first, because most of the tortious conduct at issue here did *not* occur on enclaves, and second, because Defendants have not met their burden of proof.

As to the first, "courts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there." *Baltimore I*, 388 F. Supp. 3d at 565 (collecting cases); *Coleman*, 2019 WL 3817822, at *3. Here, the pertinent events—the misrepresentations and omissions Defendants made in connection with the sale of fossil fuel goods—overwhelmingly occurred outside of any discrete federal enclaves. *See New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1146 (D.N.M. 2020) (holding "partial occurrence on a federal enclave is insufficient to invoke federal jurisdiction" where waterways identified as enclaves "ma[de] up only a small fraction" of contaminated waterbodies at issue); *Ballard v. Ameron Int'l Corp.*, No. 16-CV-06074-JSC, 2016 WL 6216194, at *3 (N.D. Cal. Oct. 25, 2016) (remanding state-law asbestos-related claims where plaintiff worked for defendant on military base, but asbestos exposure there was "just a small portion of the total exposure: one of 17 locations and during six months of the years-long exposure period"); *San Mateo I*, 294 F. Supp. 3d at 939 ("Nor was federal enclave jurisdiction appropriate, since federal land was not the 'locus in which the claim arose.'") (citation omitted).

Defendants cite two cases for the proposition that "[f]ederal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave," NOR ¶ 191, but they mischaracterize them both. In *Durham*, the passage Defendants quote actually relates to whether and when a defendant has notice that a complaint reveals a potential basis for federal jurisdiction: "The complaint revealed that some of Durham's claims arose on federal enclaves,

56

so . . . [the defendant] had thirty days from when it received the complaint to remove to federal court." 445 F.3d at 1250. Whether a complaint discloses sufficient facts to trigger the 30-day removal deadline is entirely different from the question of whether federal enclave jurisdiction applies. In *Corley v. Long-Lewis, Inc.*, the plaintiff was "continually exposed" to asbestos-containing products when he "performed a substantial amount of work" on naval bases over his 17 years in the Navy. 688 F. Supp. 2d 1315, 1317, 1328 (N.D. Ala. 2010). The *Corley* court concluded that enclave jurisdiction applied, rejecting plaintiff's argument that he was exposed to more asbestos outside the enclaves than in them, because "[t]he fact that the injury occurred [on a federal enclave] is sufficient." *Id*. at 1329. Thus, *Corley* actually supports the State's argument that the location of *injury*—here, non-federal land—is the critical factor in determining enclave jurisdiction.

Second, where tortious activities "allegedly occur partially inside and partially outside the boundaries of an enclave," defendants bear a "higher burden" of proof regarding federal jurisdiction because "the state's interest increases proportionally, while the federal interest decreases." *Ballard*, 2016 WL 6216194, at *3. Here, Defendants have offered no evidence of enclave jurisdiction—only vague assertions that the Complaint "necessarily sweeps in" oil and gas activities on federal enclaves, NOR ¶ 192, and that "the Complaint relies upon conduct occurring in the District of Columbia,"[26] itself a federal enclave, NOR ¶ 193. This is insufficient. It cannot be said that the State's claims "arose" on federal enclaves merely because a few Defendants allegedly conducted

---

[26] Defendants' argument regarding conduct in Washington, D.C., as a basis for enclave jurisdiction was soundly rejected in *Baltimore I*, 388 F. Supp. 3d at 565 ("That a claim is based on conduct that occurred in [D.C.], therefore, does not *ipso facto* make it a federal claim over which federal question jurisdiction lies. Rather, it must arise under federal law. . . ."). Moreover, Defendants' irrelevant and incorrect claim that the State infringes on their First Amendment rights does not give rise to enclave jurisdiction. "The States . . . are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 638 (1985).

some operations there—especially since the State expressly defines the scope of injury to exclude any federal territory. Federal enclave jurisdiction is improper here.

### H.     The Class Action Fairness Act does not apply because this case is not a class action.

Next, Defendants invoke CAFA, claiming that this lawsuit qualifies as a removable "class action" under the statute simply because the State seeks to protect the interests of its residents. *See* NOR ¶¶ 195–99.[27] CAFA does not sweep so broadly, however; a conclusion reached by every appellate court to consider this line of argument.

For purposes of removal, CAFA defines a "class action" as "any civil action filed under Rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure." 28 U.S.C. § 1332(d)(1)(B). To determine whether a case meets this definition, a court does *not*—as Defendants suggest—focus on the factual allegations in a complaint. *Cf.* NOR ¶ 199 (listing allegations relating to Delaware consumers). Rather, it "look[s] to the rule under which [the] case was filed" and inquires whether that rule contains procedural requirements that are similar to those of Rule 23. *Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 160 (3d Cir. 2013).

Defendants make no attempt to identify procedural similarities between Rule 23 and the state laws authorizing the Attorney General to initiate and maintain the present lawsuit (namely, 6 *Del. C.* § 2522, 29 *Del. C.* §§ 2504 & 2522). And indeed, these state laws "contain[] none of the defining characteristics of Rule 23." *Erie Ins. Exch.*, 722 F.3d at 158–59. They do not, for example, impose requirements for adequacy of representation, numerosity, commonality, typicality, or class

---

[27] Defendants do not claim that this lawsuit is removable as a "mass action" under CAFA, nor could they because "the State . . . is the only named plaintiff in the instant action." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 164 (2014) (holding "a 'mass action' must involve monetary claims brought by 100 or more persons who propose to try those claims jointly as named plaintiffs").

certification—the "hallmarks of Rule 23 class actions." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 216 (2d Cir. 2013); *see also Erie Ins. Exch.*, 722 F.3d at 159. Nor do they provide for notice to "absent class members," "permit individual class members to opt out," or "provide for the appointment of a lead plaintiff or class counsel." *Erie Ins. Exch*, 722 F.3d at 159. Instead, these statutes simply authorize the Attorney General to file suit on behalf of the State. *See* 6 *Del. C.* § 2522, 29 *Del. C.* §§ 2504 & 2522. And as six appellate courts have held when faced with similar state laws, CAFA does not apply merely because an attorney general acts "as the legal representative of the State to vindicate the State's sovereign and quasi-sovereign interests" in protecting the general health and welfare of its citizens and consumers—as is the case here. *CVS Pharmacy*, 646 F.3d at 176; *see also Nessel ex rel. Michigan v. AmeriGas Partners, L.P.*, 954 F.3d 831, 833 (6th Cir. 2020); *Purdue Pharma*, 704 F.3d at 212–20; *Mississippi ex rel. Hood v. AU Optronics Corp.*, 701 F.3d 796, 799 (5th Cir. 2012), *rev'd on other grounds*, 571 U.S. 161 (2014); *LG Display Co. v. Madigan*, 665 F.3d 768, 770–72 (7th Cir. 2011); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848–49 (9th Cir. 2011).

The purpose of CAFA was to address "[a]buses in class actions [that] undermine[ed] the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction." Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 § 2(a) (2005). Nothing in the statute suggests that it was intended to render removable any and all *parens patriae* actions brought by a state attorney general on behalf of the people of a state, which would be the inevitable result of Defendants' strained reading of the statute. Indeed, the opposite is true: "[W]hen an action has been brought by a state or one of its officials or subdivisions, the need to resolve doubts against the exercise of federal jurisdiction is particularly acute." *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 354 F. Supp. 3d 1122, 1124 (N.D. Cal. 2019) (citing

*Franchise Tax Bd.*, 463 U.S. at 21 n.22 ("[C]onsiderations of comity make us reluctant to snatch

cases which a State has brought from the courts of that State, unless some clear rule demands it."));

*CVS Pharmacy*, 646 F.3d at 179 ("While it is true that West Virginia voluntarily entered into its

own courts to enforce its laws, it did not voluntarily consent to removal of its case to a federal court,

and a federal court should be most reluctant to compel such removal, reserving its constitutional

supremacy only for when removal serves an overriding federal interest.").

Defendants, for their part, identify no case that even remotely supports their expansive

reading of CAFA.[28] Instead, they rely primarily on legislative history that the Third Circuit and its

sisters have discredited as "particularly suspect," *Erie Ins. Exch.*, 722 F.3d at 160 n.6; "a

questionable source of congressional intent," *CVS Pharmacy*, 646 F.3d at 177; "contradictor[y]",

*Chimei Innolux*, 659 F.3d at 850 n.3; and of little "value as a means of discerning congressional

intent," *Coll. of Dental Surgeons Of Puerto Rico v. Connecticut Gen. Life Ins. Co.*, 585 F.3d 33, 38

n.2 (1st Cir. 2009).[29] In any event, even if CAFA's definition of a "class action" is liberally

construed (as called for by some members of the Senate Judiciary Committee), that definition

cannot stretch so far as to encompasses lawsuits filed under state laws that contain *none* of the core

---

[28] In passing, Defendants cite *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740 (7th Cir. 2013), and *Williams v. Emp'rs Mut. Cas. Co.*, 845 F.3d 891 (8th Cir. 2017). Both cases are distinguishable, however, because they involved plaintiffs whose authority to bring suit depended on them being representatives in a prior class action. *See Addison Automatics*, 731 F.3d at 742; *Williams*, 845 F.3d at 900.

[29] Similarly, Defendants read too much "into the fact that Congress rejected an amendment to CAFA that would have exempted suits by state attorneys general." *Massachusetts*, 462 F. Supp. 3d at 50. As an initial matter, "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 187 (1994). And that truism applies with particular force here because CAFA's legislative history presents conflicting reasons for why that amendment did not pass. *See CVS Pharmacy*, 646 F.3d at 177 (identifying contradictory statements about the proposed amendment made by the *same* senator).

procedural requirements of Rule 23. *See Erie Ins. Exch.*, 722 F.3d at 158. For these reasons, the Court should reject Defendants' baseless assertion of CAFA jurisdiction. *See Massachusetts*, 462 F. Supp. 3d at 47–51 (rejecting similar arguments raised by ExxonMobil in an analogous case).

**I.      Defendants' attacks on the merits of the State's claims are misguided.**

Finally, Defendants attack the merits of the State's lawsuit, asserting that they could not have misled the public about the dangers of their fossil fuel products because everyone already knew about the risks of global warming. *See* NOR ¶¶ 207–25. The Court should reject this merits challenge out of hand for two independent reasons.

First, it is premature. As the Third Circuit has explained, courts should evaluate motions to remand using "the same analytical approach" developed for motions to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Papp*, 842 F.3d at 811. And that means that, when resolving a remand motion, a district court must take care not to decide issues that "bleed[] into the merits of the case." *Id.* at 811 n.4; *see also Cessna v. Rea Energy Coop., Inc.*, 753 F. App'x 124, 1128 n.2 (3d Cir. 2018). Accordingly, this Court must decline Defendants' invitation to resolve thorny issues of fact that go to the heart of the State's theory of liability. *See Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016) ("We have repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits.").

But even if the Court were to consider Defendants' attacks on the merits of this lawsuit, it should find them misguided and unavailing. As purported proof that the State's claims are "absurd," NOR ¶ 219, Defendants point to a handful of publications that accurately reported on the climate

risks of Defendants' fossil fuel products, *see*, *e.g.*, *id.* ¶¶ 209–12.[30] But the fact that some people published truthful information about global warming does not eliminate "the source of tort liability" in this case, namely: Defendants' decades-long campaign to conceal and affirmatively misrepresent the dangers of fossil fuels to consumers, regulators, and the public writ large. *Baltimore II*, 952 F.3d at 467. Indeed, where companies have engaged in analogous campaigns of concealment and deception, courts have not hesitated to hold them liable for the harms caused by their products, notwithstanding evidence suggesting that those harms were known to some segments of the population, including government officials. *See*, *e.g.*, *ConAgra Grocery Prod.*, 17 Cal. App. 5th at 65, 93, 119 (lead-paint companies liable for knowingly promoting a hazardous product, notwithstanding evidence suggesting that, "[s]ince the 19th century, the medical profession has recognized that lead paint is toxic and a poison"); *State v. Purdue Pharma L.P.*, No. CJ-2017-816, 2019 WL 9241510, at *8–9, 12, 14 (Okla. Dist. Ct. Nov. 15, 2019) (pharmaceutical companies liable for their "misleading marketing and promotion of opioids," notwithstanding evidence that government agencies were aware of the addiction risks of opioids); *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 26, 35–36 (D.D.C. 2006) (tobacco companies liable for "unlawful conspiracy to deceive the American public about the health effects of smoking," even though scientists and the media had been reporting on these harms since the 1950s).

---

[30] Defendants also purportedly identified thousands of articles in newspaper archives that contained the phrases "greenhouse effect," "global warming," or "climate change." NOR ¶ 212. But because these search results do not indicate whether the articles provided accurate or misleading information about climate change, they lend no support to Defendants' assertion that everyone already knew about the dangers of fossil fuel consumption. Indeed, as the State documents in the Complaint, Defendants themselves contributed to the public discussion on climate change—albeit, by flooding consumers, regulators, and the public with false and misleading representations about the existence, causes, and adverse consequences of climate change. *See* Compl. ¶¶ 108–41.

This case is no different. As the Complaint documents, public awareness of climate change was growing at the end of the 1980s—and with it, calls for fossil fuel regulation. *See* Compl. ¶¶ 106–07. But when Defendants heard those calls, they acted swiftly to protect their bottom line, orchestrating a sophisticated and widespread disinformation campaign to undermine the science of climate change. *See id.* ¶¶ 108–41. Taking a page out of Big Tobacco's playbook, Defendants spent millions of dollars trying to convince the public that the existence, causes, and adverse effects of global warming were "open question[s]"—even though, internally, Defendants harbored no such doubts. *Compare Philip Morris*, 449 F. Supp. 2d at 208 (finding that the tobacco industry "mounted a coordinated, well-financed, sophisticated public relations campaign to attack and distort the scientific evidence demonstrating the relationship between smoking and disease, claiming that the link between the two was still an 'open question'") *with* Compl. ¶¶ 108–41 (documenting similar efforts by Defendants to undermine climate science). And even as Defendants publicly insisted that fossil fuel regulations would be premature in light of the unsettled science, they internally took steps to protect their own assets from negative climate impacts and to take advantage of new profit opportunities that would come with a warmer world. *See* Compl. ¶¶ 142–47.

It is that affirmative misconduct—a purposeful disinformation campaign that continues, to this day, to misrepresent the climate impacts of fossil fuel products—that renders Defendants liable to the State under Delaware law. Defendants cannot escape the legal consequences of their egregious misconduct simply by noting that others decided to do the right thing and publish accurate information about the existential threat of global warming.

## V.   CONCLUSION

For the foregoing reasons, the State requests that this Court remand the Complaint to state court.

Respectfully submitted,

Dated:  January 5, 2021

*/s/ Christian Douglas Wright*
Christian Douglas Wright (#3554)
  Director of Impact Litigation
Jameson A.L. Tweedie (#4927)
  Special Assistant Deputy Attorney General
Ralph K. Durstein III (#0912)
  Deputy Attorney General
DELAWARE DEPARTMENT OF JUSTICE
820 N. French Street
Wilmington, DE 19801
Tel. (302) 577-8600
christian.wright@delaware.gov
jameson.tweedie@delaware.gov
ralph.durstein@delaware.gov

Victor M. Sher, *pro hac vice*
Matthew K. Edling, *pro hac vice*
Adam M. Shapiro, *pro hac vice*
Nicole E. Teixeira, *pro hac vice*
SHER EDLING LLP
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
Tel. (628) 231-2500
vic@sheredling.com
matt@sheredling.com
adam@sheredling.com
nicole@sheredling.com

Attorneys for Plaintiff *State of Delaware*